**Willard Bishop JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 51919.**

Court of Criminal Appeals of Texas.

March 9, 1977.

Dissenting Opinion On Motion for Rehearing Denied June 8, 1977.

James P. Finstrom, Dallas, court appointed, for appellant.

Henry Wade, Dist. Atty., John H. Hagler, J. Russell Ormesher, Steve Tokoly and Les Eubanks, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

ODOM, Judge.

Appellant was convicted of robbery by firearms under the former Penal Code.[1] Punishment was assessed at life imprisonment after he elected to be punished under the new Penal Code pursuant to Sec. 6(c) of Acts 1973, 63rd Leg., ch. 399.

Since we must reverse, we will only consider one of the numerous grounds of error presented for our review. Appellant contends that the trial court committed reversible error by excluding the entire testimony of William Boyd. We agree, and shall give our reasons after a discussion of the nature of the case.

Appellant presented three interrelated defensive theories at trial. These included:

1. An alibi asserting he was in Austin or travelling between Austin and Dallas on the night of November 28, 1971, at the time the offense occurred.

2. That another person committed the crime. This theory was supported by the

1. Appellant was originally convicted of rape. He was subsequently charged with robbery af-

ter we reversed the rape conviction. *Jackson v. State,* Tex.Cr.App., 507 S.W.2d 231.

confession of John Lewis to the offense appellant was charged with committing.

3. That complainant misidentified appellant.

The State was fully aware of these defensive theories.

To secure appellate review of his ground of error, appellant presented the testimony of William Boyd outside the presence of the jury. These statements reflect that Boyd had erroneously identified appellant as having committed a crime later discovered to have been committed by John Lewis. Boyd testified that on December 19, 1971, he and his wife were abducted at gun point in Longview, driven into Harrison County and held for two and one-half hours. Boyd's wife was raped during this period.

Later, Boyd went to Dallas to observe a police lineup. There, he identified appellant as the criminal. Subsequently he renounced that identification and accused John Lewis of the crime.

The trial court concluded this evidence was not material to any issue in the case. The court also excluded from evidence the card signed by Boyd after the lineup was held in February of 1972. It stated:

"I have identified No. 3 in the lineup." The appellant was in the third position in the lineup. John Lewis was subsequently indicted for the offense against Mrs. Boyd.

Identification of the appellant was a crucial issue at the trial. Eyewitness testimony was introduced both to show appellant was the criminal actor and to prove that he was not in Dallas at the time of the offense. John Lewis, a person serving five life sentences, confessed in open court to the crime for which appellant had been indicted.

Boyd's testimony would have been very valuable to the defense. Lewis could be impeached because he was already serving five life sentences. A conviction for another crime would pose no serious consequences for him. Boyd, on the other hand, had no motive for lying.

Clearly, the testimony that Boyd would have provided was germane and material to the issue of identification and to the defensive theory propounded by appellant. This evidence was highly relevant because it tended to prove not only that Jackson had been misidentified but that his identity had been previously confused with John Lewis, the person who confessed to the offense charged in the case at bar.

Our case is similar to the situation confronted by the Fifth Circuit in *Holt v. U. S.,* 342 F.2d 163 (5th Cir. 1965).[2] The court in that case reversed the district court's decision to exclude evidence which tended to prove that the accused had been previously misidentified as the perpetrator of similar crimes. In its discussion, the Fifth Circuit stated:

"While we find no federal authority to this effect, there are two well reasoned state Supreme Court opinions on the subject which we find persuasive. In *Commonwealth v. Murphy,* 1933, 282 Mass. 593, 185 N.E. 486, the principle was recognized and applied that where the identity of a defendant is an important issue in a prosecution for a crime, evidence showing that another person similar in appearance to the defendant was committing similar crimes at about the same time, and that one person had mistakenly *identified the defendant as such criminal* is admissible. The court limited the admission of evidence of this character to instances where it was not too remote in time, nor too weak in probative quality, and where it was so connected with the act forming the issue on trial as to indicate a relevant relationship."

The conclusions of the Massachusetts Supreme Court and the Fifth Circuit represent sound principles of the law of evidence and should be applied to the case at bar. The record reflects that:

**2.** Judge Morrison discussed the *Holt* decision in *Florio v. State,* Tex.Cr.App., 532 S.W.2d 614, where it was distinguished in footnote 1 because in *Florio* there had been no misidentification in the other offense, nor was the identity of the offender in the other offense established. The instant case is distinguishable from *Florio* on the same points, and is indistinguishable from *Holt.*

1. John Lewis confessed to the crime appellant was charged with committing.

2. John Lewis was indicted for the offense against Mrs. Boyd.

3. The offense charged in the case at bar and the offense against Mrs. Boyd occurred within one month of each other.

4. Mr. Boyd identified the appellant at a lineup as the possible perpetrator of the criminal assault on Mrs. Boyd.

5. John Lewis' action in other crimes was similar to those charged against appellant in the case at bar.

6. Appellant's identity was the major issue at the trial.

We hold that the exclusion of Boyd's testimony was error. The evidence was material to the central issue of the case and of substantial probative value to appellant.

The circumstances of the case at bar present a unique factual situation. To avoid an overbroad interpretation of our decision herein, we wish to emphasize that the exclusion of Boyd's testimony was error because it was not too remote in time, nor too weak in probative quality, and it was so connected with the act forming the issue on trial as to indicate a relevant relationship.

The judgment is reversed and the cause remanded.

DOUGLAS, Judge, dissenting.

The majority reverses this conviction because the court would not admit testimony of Boyd that appellant was identified by him as a "possible" assailant in an unrelated offense which occurred in Marshall, some 150 miles from Dallas where the present offense was committed. A full summary of the evidence is set out below to show that no error was committed.

J_____, the injured party, testified that at approximately 11:00 p. m. on the evening of November 28, 1971, she drove up to her apartment in Dallas, parked her car, walked up the stairs and unlocked the door. When she discovered that the chain lock was in place, she called her roommate, Marilyn Talley, through the partially opened door. While she was waiting for Marilyn, she heard somebody behind her. As she turned around a man asked her if she knew the location of a certain apartment number and she replied that she did not. He then asked her the location of the Blue Chip Club and she pointed it out to him. In the meantime her roommate came to the door.

Marilyn Talley testified that around 11:00 p. m. she heard a knock and got up, turned the lights on in the bedroom and living room and went to the door. After she found out it was her roommate she unlocked the chain and returned to her room. She had left all of the lights on when she returned to her bedroom.

J_____ testified that she then went in and put her things on the coffee table and the floor, and when she returned to the door this individual was still standing there. He asked her if he could use the telephone. She told him no but offered to make the call for him. She was a legal secretary and was accustomed to placing calls. Because she did not have pencil and paper handy, she had him repeat the number three or four times. She stated: " . . . the first five digits were 745 and 82 and I am not sure if it was 31 or 13; I do not remember for sure what the last two numbers, their order. I know what the numbers were, but I do not remember their sequence of number." Thus, it was established that appellant had used the RI exchange and the numbers 582 along with two other numbers, the order of which is uncertain. The record reflects that appellant's license plate number was "582," a number with which he was familiar. She then shut the door but did not lock it. She didn't feel any mistrust for him because the breezeway was well lighted and she had got a good look at him because he was only a foot or so away when she was talking to him. His speech " . . . did not have any accent, it was very clear, plain and distinct. His grammar, the using of the English language was very good, . . There was no accent in it that if you turned around you would not know that it was a black person that was talking." "He was immaculately dressed; his hair was perfect, his coat was very neat and everything

about him gave the appearance that, you know, he was a nice man. He was very nice looking, very mannerly, he said please, he said thank you, there was no reason for me to think that he was anything else beside a very well respected man." She then identified appellant as the individual who had come to her apartment.

She related that just after she had lifted the receiver and punched approximately the first three numbers, she heard the door open and a second later he appeared in the door with a glove on one hand and tugging on the second for a better fit. He had a gun in the gloved hand and said, "This gun is cocked and I don't want to use it, but I will if you don't cooperate with me," so she hung up the telephone. The gun " . . . had a cylinder or a barrel that goes around," and she identified State's Exhibit No. 9 as the weapon similar to the one used. State's Exhibit No. 9 was a .22 caliber revolver found during the search of appellant's home shortly after his arrest in January, 1972. He told her to tell her roommate he was there. When she went to Marilyn's bedroom, he followed her down the hallway. Talley testified that very soon after she had let J_____ in the apartment she appeared in her bedroom door and said, "Marilyn, we have a visitor." Her face was white and she appeared to be frightened. When she stepped forward she saw a man who said, "Tell her why I'm here." She said that he had on black gloves and had a pistol in his hand.

J_____ said that he spun the cylinder of the gun and said, "See, this gun has bullets in it," and then demanded their money. When J_____ said, "Well, my purse is in the living room," appellant replied, "I want your money, let's go into the living room and get your money." He then marched both of them back into the living room and had J_____ dump her purse on the floor and remove the money ($50.00) from the billfold while Talley emptied the coin purse. Appellant took the money and had the girls return to Marilyn's bedroom where he got her purse from the closet and took two or three dollars. He then threw a nickel on the bed and said, "Here is a nickel for bubblegum." Talley described his demeanor as " . . . just kind of arrogant, like he was in absolute control, he just looked scary. . . . He had a very evil expression on his face, very sadistic." Appellant then told J_____ to take off her clothes and that " . . . if we cooperated with him, he would not hurt us and I was in fear that if I did not cooperate that he would shoot us." Marilyn was clad in a navy blue nightgown with white trim and housecoat. J_____ stated that she was wearing a matching pants and coat set, " . . . it was kind of a tweed material, it was orange and little bits of brown and beige and the pants matched the coat, it was a long coat," with a white sweater, brown boots, and a gold necklace. Marilyn said that appellant became impatient and told J_____, "Hurry up because I want some p___y." While Marilyn was still in her robe standing next to the side of the bed, appellant had J_____ sit on the very end of the bed with her feet hanging over the side. He unzipped his pants and penetrated her; she stated that it hurt, he had positioned himself so that "he was standing on his feet, his knees were a little bent and I was right on the corner of the bed so he didn't have to lay down and the only thing he did was unzip his pants and rape me." After ten or fifteen seconds he withdrew his male organ and " . . . told me to finish it and he put it in my mouth." After he reached a climax, he pointed the gun at her head and told her to swallow it. Marilyn, who was made to stand by and watch, testified in the same manner and further stated that during the acts " . . . he seemed to be in absolute control the whole time, . . . he sort of leaned over her, but he never did like lie on the bed or anything like that," he seemed to be able to watch her every move. Talley stated that he then made her undress, which she did except for her surgical garment, an elastic vest which covered the bandages that were about her chest and breast area.

According to J_____, he then had both of them get into bed, he was standing by the side of the bed and with the gun point-

ed at the floor clicked it two or three times and said, "See, you girls didn't have anything to worry about, bang, bang," and then almost immediately shot them, hitting her in the face.

Marilyn testified that:

"He told us both to lie down in the bed. He was standing right by the side of the bed by the closet and he sort of laughed and he clicked the gun a couple of times and he said, 'See, you girls didn't have anything to worry about anyway,' just sort of, it was just completely sadistic, and at that point I said, 'Please leave us alone, we won't call the police or anything if you will leave,' and at that point he shot both of us. I just heard two shots, very close together and I could smell the gunpowder and everything and I looked over at J_____ and she had blood running out of her nose and I looked down and I saw blood on the sheet and all I could think about to do at the time was to get help or something. The phone was on the bedside table on my side, so I picked up the receiver and just as I picked it up I heard J_____ say, 'No, Marilyn, don't do that,' and at the same time he came running back into the room."

J_____ stated that she could see appellant just standing outside the door when he left the room, and knew that Talley could not, so when Marilyn reached for the telephone she said, "Please don't do that." She said that appellant returned to the room and said, "So I see we are trying to be a smart bitch." J_____ pleaded with him to just yank the telephone from the wall and leave. He grabbed the phone and yanked on it while J_____ just ". . . laid back down and started praying because I figured he was going to kill me this time." She saw him bend over Marilyn but could not tell what he was doing.

Talley stated that after he grabbed the telephone and either ripped or cut it out from the wall he stabbed her; she couldn't remember how many times, "I don't remember. I just saw his hand, I saw the knife flashing around my neck. I found out later that he had stabbed me four times."

A minute or two later, J_____ heard the front door close and said to Talley, "Marilyn, he's gone now." She then went into her room to call police. The telephone in the kitchen had also been pulled from the wall. When she returned she saw that Marilyn ". . . was completely white." She gave her mouth-to-mouth resuscitation at intervals until the police and ambulance arrived about five or ten minutes later.

J_____ then gave the following description of their assailant to the officers who arrived on the scene:

"He was about five ten, he weighed between 150 and 160 lbs. He was a black male, he had a short, it wasn't really an Afro, it was a well-rounded hairstyle. He had on a sport jacket that was dark green with a dark, I believe it was a black shirt, and dark pants and he had a black patent leather belt and he had black shoes, black shoes that had silver buckles. They buckled in the center, then they had bands that connected to the edge of the shoes on top. They were a loafer type shoe."

Both girls were hospitalized. The bullets could not be removed.

The evidence also showed that appellant was a frequent bowler and that he had bowled several nights at the Cotton Bowling Palace both in league play and "pot" bowling. In fact, appellant testified that on the night of his arrest he was on his way to the Cotton Bowling Palace to participate in a "pot" match. He stated that "pot" bowling was a game in which all bowlers put money in a "pot" and the winner would take all.

Investigators had found Negroid head hairs and pubic hairs in the girls' apartment. The Negroid hairs found in the apartment were compared to sample hairs taken from Jackson through neutron activation and the result showed that the hairs were indistinguishable and that only one in one and a half million people would have the same observable characteristics. Dr. John Randall of the Nuclear Science Center at Texas A&M University testified that the

hairs were found to be "similar in all observable characteristics" and "indistinguishable" and that there was "no method by activation analysis that you could tell one from the other. . . ." He further stated that " . . . the number of people you would have to examine to find this particular distribution is one in one and a half million you would have to sample, and examine one and a half million people with the probability of finding one single person with this distribution." State's Exhibit No. 37, a 1970 census population report of Texas was admitted wherein it showed that there were not one million five hundred thousand Negro males in the entire State of Texas, let alone Dallas County.

Jackson had also presented an alibi defense. He testified and attempted to prove through several witnesses that he and his wife were together at her parents' home in Austin until 9:30 p. m. the evening of the offense. Not only was Jackson's testimony impeached by the State, but the testimony of his alibi witnesses was discredited by testimony as well as documentary evidence. His alibi testimony and that of his witnesses was replete with inconsistencies.

John L. Lewis, was called as a witness. Before he was allowed to testify in the presence of the jury he testified before the court. On direct examination, Lewis testified that he was the person who had raped and shot J_____.

According to his version of the sequence of events, he was hiding behind a car outside some apartments on Cedar Springs at approximately 11:00 p. m. the evening of November 28, 1971, when he noticed a lady coming from the direction of a nearby night club and start up the stairs toward her apartment. He followed her and asked her if he could use her telephone, she refused and offered to make a call for him. He stated that she went in the apartment, closed the door but did not lock it. "I walked in and pulled my pistol on her, asked her who was there and she said no

one but her roommate. So I told her to take me to where the roommate was." He said the pistol was a .22 caliber he had obtained from Calvin Bentson, a partner of his in a robbery, now serving a life sentence, and that when he obtained the gun it didn't have any "bullets" but he got two from his house. Once they were in the roommate's bedroom he took a watch from J_____, along with $54.00 and some change, " . . . then I forced her [J_____] to have intercourse with me, then I forced her to have, perform a sodomy on me."

He then stated that before he shot the two girls "I pointed it [the gun] at them, told them they didn't have anything to worry about, they just wanted to do it," then snapped the gun four times after which he stated that he shot J_____ and then Talley. Lewis said that he remembered Talley having bandages on her chest and that when Talley reached for the telephone, "I stabbed her and snatched it away from the wall."[1] Defense counsel also asked him if he had ever had any conversations with Detective Poe, to which he replied, "Yes, sir."

On cross-examination the prosecutor established that while Lewis had testified on direct that he had completed the ninth grade and spoke fairly good English, he in fact had made C's and D's and did "poor" in English.

Lewis also stated that he had murdered a George W. Filmore and a Miss Beharnds on separate occasions and again reiterated his testimony given on direct that he had on two occasions denied to Detective Poe ever having been to an apartment on Cedar Springs, the place where this offense occurred. But he then said that at his initial conference with Poe he had denied any knowledge of this offense but later confessed to the entire offense.

Lewis said that following his indictment for the murder of Filmore and his receipt of notice that the State would seek the death penalty he confessed in general terms to

---

1. When he testified outside the presence of the jury, Lewis said: "I pointed the gun at Miss Talley, pulled the trigger and shot and I did not know if I hit her, so I took my knife out and stabbed her up around here."

having committed this offense to Deputy Jesse Earls, the jailer, in March of 1972. In June he was given a sanity hearing in connection with the murder of Filmore.

He also testified that he admitted committing several other murders to Investigator Johnny Webb of the Dallas County Sheriff's Office. However, he denied saying to Webb, "Okay, Mr. Webb, I did not commit the crimes that I have told you I committed," including this offense when Webb confronted him with a number of errors he had made in stating the manner of commission of this and other offenses. Lewis also denied Webb asking him, "Then why are you trying to cop out to something you didn't do?", to which he responded, "Some of the people in the cell with me told me if I would admit to all of these killings I could go the crazy route on my own case." But he did recall Webb's statement, "Well, what they are trying to get you to do is to admit to their crimes so they go free"; however, he denied responding, "Well, what does it matter, I am going to the pen anyway." When questioned about his knowledge of the purported facts of this case he admitted to reading articles in the newspapers and having listened to the radio at the time the girls were shot and when Jackson was arrested. He denied any knowledge of the examining trial but stated that he was in the same hold-over cell with appellant for about fifteen minutes a day or two before this trial.

Webb testified that he had interviewed Lewis as a result of a call from Jailer Earls. He said that Lewis had told Earls that he and not Jackson had committed the instant offense. At the time Webb was working on approximately twenty-two unsolved female killings. Lewis admitted that he had committed a rape and some homicides. When he asked Lewis which rape, Lewis said it was the one that Jackson, the school teacher, was in jail for. Since Webb was working primarily with homicides he told Lewis that he ". . . would have to get somebody else to talk to him about that offense, . . . ." Webb did, however, talk to Lewis about the homicides at Lewis' request. Webb testified that Lewis confessed to sev-

eral homicides in "generalities" but could not give "specifics." Webb cited as an example of Lewis' inability to provide "specifics" the homicide of a young school teacher, Linda Phillips, to which Lewis had confessed. Lewis had stated that he had shot Phillips with a pistol and he could not remember whether or not she was nude or fully clothed when he left her. Phillips was not shot, she had been cut with a knife and left lying beside a road nude. When Webb asked Lewis why he was trying to confess to crimes he had not committed, Lewis replied, "Well, I am going to the penitentiary anyway."

When Lewis was questioned about bowling, he denied ever having bowled and stated that he had only been to the Cotton Bowling Palace on one occasion and that was to take Calvin Bentson there. Marion Roberts testified that she had married Lewis on January 25, 1972, after having met him the early part of December, 1971. She said that Lewis was a bowler and that they had bowled together on several occasions at the Cotton Bowling Palace. There were also times when he would go bowling without her. He denied having been there during the months of November or December.

Next, Lewis was questioned concerning an interview he had on September 11, 1974, with Investigators Davis and Westbrook of the district attorney's office. He stated that he had told them that he had committed this offense of "either the 27th or 28th," and denied saying that he could specifically remember the date but could not recall what day it was but did ". . . recall saying that I remembered it was along the end of November, 27th or 28th. He said which, and I said the 27th, then. He said, 'Was it on a week-end or was it up in the week, Wednesday, Monday or what?' I said it was close to the week-end." As to the time of occurrence, he said Davis and Westbrook had suggested between 12:00 and 12:15 a. m., and he agreed with them.

His testimony already discredited in several instances mushrooms into an unlikely tale as to how he had committed the of-

fense. On cross-examination the State posed direct questions pointed at exposing inconsistencies and verifying his version of how he committed this crime for which Jackson was being tried. First of all, Lewis vehemently denied giving J——— a number to call for him: "I am telling you that I did not give a phone number." He then said that J——— was clad in a red coat and white trousers.

After it was established that he had in fact told Davis and Westbrook that he robbed the women first and then committed the rape and subsequently told them that he committed the rape and then the robbery, he was requested to give his version of how the rape was committed. First, he said that both women were lying on their backs in the bed, and "I had Miss J——— to come down along the edge of the bed and I had intercourse with her and then after that had her sit up on the edge of the bed and perform a sodomy act on me." When queried further as to how he had intercourse with J——— he replied, "On top of her, I screwed her." To insure that there was no uncertainty the prosecutor asked him if, using his own words, he got on top of her, physically climbed on top of her and screwed her, and he said yes. Lewis said that he reached two climaxes, one during intercourse and one during the sodomy act. He said the act of intercourse lasted thirty-five or forty-five minutes, but then said, "It was long enough to reach two climaxes; I wouldn't want to give a time on it, but if I have to give a time, I would say it could have been two or three minutes." He reiterated that he reached a climax during each act.

Dr. John Jeffers, a specialist in obstetrics and gynecology, testified that he had examined J——— when she was brought into Parkland Hospital the night of November 28, 1971. His examination revealed that she had had recent intercourse and that there were signs of forced penetration by a male organ. He also testified that he did not find any spermatoza in the vagina area but did find sperm on a swab taken from her throat.

Lewis was questioned by the prosecutor on his direct testimony wherein he had said that he had snatched the telephone from the wall. He interrupted counsel for the State on one occasion to say that he snatched it from Talley. He did admit to having told Investigators Davis and Westbrook during one interview that he never saw a telephone in either the living room or the bedroom, and in a subsequent interview, said that he never saw a telephone because he wasn't looking for one.

At the final part of cross-examination, Lewis was asked to describe his dress on the evening in question. "I had some black leather gloves on, black quarter-length coat, leather coat matching the gloves, black trousers and black pair of patent leather shoes with gold buckles across the top of them, and a belt." The leather coat was of a length down to the knees. Marion Roberts testified that Lewis owned a pair of black patent leather shoes with *silver* ornaments on them and he also owned a three-quarter length leather coat. She also said that he had never owned a green tweed coat and that he frequently wore the leather coat.

Defense counsel read into the record the prior testimony of Deputy Jesse Earls as proof of a prior consistent statement by Lewis. Earls had testified that Lewis had told him he had raped J——— only because Talley was crying and had bandages on her chest. He had also told Earls that he had started to leave after the rape of J——— but heard someone pick up a telephone so he returned because he thought they might call the police and at that time shot one girl in the face and stabbed the other. The testimony of Earls showed inconsistency, not consistency.

During recross-examination, Lewis was asked to describe the bandages he had seen on Talley. He said that they were two bandages about four and a half-inches in size, yet he also admitted that he had previously told investigators that Talley was nude except for one square bandage about six inches across. Lewis also said that the front door of the victims' apartment faced

out to Cedar Springs and you could see the traffic passing by. The evidence showed that the front door faced out to a wall and the apartments were on Hudnall Street not Cedar Springs. When asked to describe the manner in which he robbed J_____, he said that after they were in Talley's bedroom he sent J_____ back to the living room to get her purse while he remained in the bedroom with Talley. J_____ was let out of his sight to go back in the living room where the front door was located. He said that J_____ came back into the bedroom with the money and he could only assume she dumped her purse out on the floor in the living room because he did not see her do so.

It is apparent that Lewis' testimony is replete with inconsistencies. In fact, his credibility had been impeached to such an extent that even defense counsel in final argument stated: "Now, as to whether Lewis did it or not I do not know. He was a witness I had to call." He went on to say, "Under the evidence, I suggest to you that Lewis knows where the watch came from. Probably he was the wheel man waiting downstairs in a car while some unknown black male friend of his went up, did all of this, robbed that girl, committed these sadistic unnatural acts, came down, divided the property and away they go. He knows and is protecting somebody that did this crime, but not this man." First, it was shown that he has given several versions of the sequence and manner of the robbery and rape, all of which differed from that given by the victims. His description of J_____'s clothing on the night of the offense was not even close. His statement that he reached two climaxes differed from the testimony of J_____ and proved false by medical testimony. The inconsistencies equate to the errors in his attempt to confess to other crimes he did not commit when he was interviewed by Lt. Webb. It would only lengthen an already lengthy opinion to elaborate further on the numerous variations in Lewis' version of how he allegedly committed this offense and the other evidence in this case.

In the words of Dr. Grigson, called as a rebuttal witness by the State, "Mr. Lewis has what is called a severe sociopathic disorder. This isn't an illness or sickness, this is a descriptive term to describe certain characteristic personalities." He said:

"These are individuals that have no conscience. Most of us at an early age develop a conscience, whenever we do something wrong or bad, we feel the guilt or shame or embarrassed by it, but some people, and we don't know why, apparently don't develop this feeling of guilt or shame or embarrassment and such is the case with Mr. Lewis. He has no conscience.

"Another characteristic of this disorder, they attempt to manipulate, since they are not dealing with a conscience, they are able to manipulate people quite easily, as long as it's to their benefit. They are after what they want; consequently, they frequently run afoul of the law, or for that matter, the family, church, spouses, it doesn't bother them whenever they do this, they simply go ahead and do what they want to do."

Grigson said that one of the characteristics of such a person is that the individual is a liar and that such characteristic was present in Lewis.

We should discuss the identification evidence presented in this case. J_____ and Talley remained firm and consistent in their identification. The evidence heretofore presented shows that both girls had ample opportunity to observe their assailant at very close distances under well lighted conditions. No one else was ever identified by either of them as their assailant, or even as a "possible" suspect. They unequivocally stated that Lewis was not the person who had robbed and assaulted them.

A hearing outside the presence of the jury was held wherein Boyd, whose testimony was kept from the jury and the cause of the reversal by the majority, testified that on December 19, 1971, he, his wife, and another couple were abducted at gunpoint from the X's Club in Marshall, 150 miles from Dallas, by a black man and held for

two and one-half hours during which time both women were raped. Boyd stated that they were brought to Dallas on February 1, 1972, to a lineup at the Dallas County Jail. In response to questions by appellant's counsel, Boyd testified that at this lineup he tentatively identified Jackson as the perpetrator of the assault committed on him, his wife, and the other couple. Specifically he said, ". . . as a *possible, I thought it looked like him.*" (Emphasis supplied). He then identified appellant as the person he saw at the lineup. Boyd further testified that subsequent to that lineup he had observed John Lee Lewis and identified him as the individual who had abducted them. On cross-examination he stated that at the time he selected appellant from the lineup, "I said *I could not have been definite then* (emphasis supplied)," and that he later identified Lewis as their assailant. He also testified that neither his wife nor the couple abducted with them had so identified appellant at the lineup on February 1, 1972, but each of them identified Lewis at his trial.

J_____ testified that she had had ample time to observe appellant and that his "high cheekbones" were the most prominent thing she remembered about his physical characteristics. She had given a very complete and thorough description to officers when they arrived. On the evening of January 15, 1972, the night appellant was arrested, J_____ was standing in the Sports Page Club talking to some people when Jackson walked in the front door. When she saw him she became visibly upset and when John Clark, one of the persons to whom she was talking, asked her what was wrong she replied, "Yes, sir, that's the man that shot me." She further stated that as appellant started up the stairs he turned and stared at her, walked up a couple more steps and again turned and stared at her.

John Clark testified that "as I was standing here there was a colored man standing here looking back over my shoulder at her and of course I wasn't sure that he was looking at her or anything; I turned around and looked, then I turned around and he had gone up here and turned around, looking again; I turned around and she had gone all to pieces at this time and I asked the other girl what was wrong. . . ." The police were called and Jackson was arrested. J_____ then was taken to the police station to witness a lineup following his arrest. She identified appellant as her assailant not only by his appearance, but his voice, ". . . it was clear and concise. It was void of any accent, it was the same as I had remembered it to be." When asked if there was any doubt in her mind as to the identity of Jackson, she replied, "There is absolutely no doubt, no doubt whatsoever."

Talley's identification of appellant was equally positive. As has previously been shown, Talley was forced to stand next to the bed and watch appellant rape her roommate. The evidence also shows that Talley had been an art major in college, specializing in life drawings. Following the night on which the incident had occurred, a police artist had drawn a composite from the description given by the girls. J_____ and Talley then re-worked the composite to a greater likeness of their attacker. Talley testified in detail as to appellant's physical characteristics that aided her in redrawing the composite. She stated that she never saw his teeth but he had "very, very full lips" with a nose that was especially broad. His face was slender with high cheekbones. With respect to his eyes in the police drawing and her own drawing, she said, "Well, I didn't feel like the eyes were quite right. I think it was because of the impression in his eyes when I seen him, you just can't capture that in the drawing, but it was as close as we could come." During her month stay in the hospital, Talley was shown some thirty or so photographs of suspects. She did not identify a single photograph as that of the assailant or even as a "possible."

On January 18, 1972, Talley was brought from her parents' home in Kerrville to Dallas to witness a lineup. At a hearing outside the presence of the jury and then in the presence of the jury she testified that the man in the number one position immediately drew her attention. His voice also

sounded like that of the assailant. She tried to get a closer look but because of construction in progress in the lineup room she was unable to get closer and the lighting "was kind of strange," all of which made it difficult to "really get a good look at him." She wanted to view his face and eyes from a closer distance. Talley requested officers to have the persons in the lineup speak again and she knew that the voice sounded right. She said to the officer with her, "That looks like him and talks like him, but I am not a hundred percent sure that's the man, but there is something missing." She testified that "he just looked totally docile and looked—he was standing pigeon-toed and he just looked nice and there was just something missing in his face, the features were right and the voice was right, but there was something missing." Talley went on to say that she had marked the identification card "NONE" because she was only 99 percent sure and she had been instructed that she must be 100 percent certain before marking an individual number. But she felt that it did not reflect her true feeling about the man in the number one position and she felt that she was "absolutely incorrect" in marking "NONE." So, "I told the policeman that I wanted another opportunity to see him in a light where I could actually get a good look at him, where I could stand in front of him and see him. I said, 'I want to see him again because this isn't right. I want an opportunity to decide whether or not I am a hundred percent sure or whether I don't feel like it's the right person. I want an opportunity to see him again.'" So she asked to see photographs and a stack of approximately six were brought to her and she started through them and ". . . I came to, I think it was the third one, I came to a picture of him sitting in a chair all by himself and I just got a complete chill up my spine. I said, 'My God, that's him.' He had the same expression on him and I knew at that moment that was the right man." She explained the difference that standing in the lineup he appeared quite docile but in the photograph he had the exact same expression as the night of the offense. The

record of the Jackson lineup was admitted as Defense Exhibit No. 7 and the number one position [Jackson] was identified as a colored male, 29 years old, six feet tall, weight of 166 pounds.

Even if *Holt v. United States*, 342 F.2d 163 (5th Cir. 1965), relied upon by the majority, would be binding on this Court, it is distinguished on the facts. The facts are so different that the case should not be even persuasive in this Court. The majority reverses this conviction because of the trial court's refusal to admit the proffered testimony of William R. Boyd because one of appellant's defensive theories was mistaken identification. The defense in *Holt* was based on mistaken identification.

In *Holt* the trial court had excluded the proffered evidence of an agent of the Federal Bureau of Investigation to the effect that Holt had positively been identified as the Earl Albert Boyd who was using stolen automobile title certificates to sell stolen automobiles in two different states on two different occasions and that such charges were later dismissed for "insufficient evidence."

In the instant case the evidence offered by appellant was to the effect that one of four victims of a crime which had occurred in Harrison County had identified him at a lineup as the "possible" perpetrator of that crime.

To show the difference in the instant case from the *Holt* case, the facts from the *Holt* opinion are as follows:

"The critical question in the case was the identification of appellant Holt. The evidence showed that ninety six title certificate blanks had been stolen in February 1962 in Idabel, Oklahoma. On July 18, 1962, a person representing himself to be Earl Albert Boyd sold a 1960 Chevrolet which had been stolen in Dallas to Adams Motors in Atlanta. Boyd obtained a 1955 Ford and a check in the amount of $1,082.15 in exchange therefor. The check was endorsed by Boyd and the proceeds paid to him. He established ownership of the Chevrolet with a title certifi-

cate which was one of the group stolen in Idabel. The proprietor of the motor company in Atlanta and his salesman both identified appellant Holt as the man with whom they had dealt. The Ford received in exchange was sold in Dallas on August 11, 1962 by a man calling himself Boyd. Again ownership was established with one of the Idabel title certificates. The purchaser in Dallas also identified appellant Holt as the seller.

"The defense was based on mistaken identity. An Oklahoma City contractor testified that during part of July 17, 18 and 19, 1962 he had been with appellant in Oklahoma City working on plans to construct an apartment building on land owned by appellant. Documentary evidence tending to corroborate this testimony was introduced, and it was also corroborated by the testimony of Mrs. Holt. Moreover, Mrs. Holt also testified that appellant was bedridden in Oklahoma City on August 11, the day it was claimed he sold the Ford in Dallas, as a result of an automobile accident in Oklahoma City on August 8, 1962.

"Appellant attempted to introduce evidence showing that he had twice before been identified as the person involved in similar sales wherein the name Earl Albert Boyd was used by the seller of the stolen automobile, and wherein certificates of the group stolen from Idabel were used. In particular, appellant proffered the testimony of an agent of the Federal Bureau of Investigation who had worked on the series of stolen automobile sales involving the use of the Idabel certificates. His testimony, taken outside the presence of the jury, was to the effect that appellant had been positively identified as the Earl Albert Boyd who sold a stolen automobile in Phoenix using one of the Idabel certificates, and that thereafter the charge was dismissed for 'insufficient evidence.' He stated that he was present at a removal hearing in the United States Commissioner's office in Oklahoma City on December 6, 1962 involving the Phoenix charge, and that the positive identification took place there.

He thus knew of his own knowledge of the identification of appellant as Boyd and of the use of the certificate. His file demonstrated that the charge was later dismissed for 'insufficient evidence.' The testimony of this agent went further to show that his files indicated that one of the certificates had been used by a person identified as appellant in the sale of a stolen automobile in California. However, this occurrence in California took place on December 6, 1962, the very day that appellant was with the agent at the hearing in the United States Commissioner's office in Oklahoma City on the Phoenix charge, and thus the agent knew of the impossibility of appellant having been involved in California. The California charge was a state prosecution but the agent offered to testify that the charge was dismissed."

Summarizing the facts set out above, the materiality and necessity of the proffered testimony to Holt's defense becomes readily apparent. He had been identified as an individual who called himself "Earl Albert Boyd" and had sold a stolen automobile to Adams Motors in Atlanta using a stolen vehicle title certificate, one of ninety-six such certificates stolen in Idabel, Oklahoma. He had been positively identified, indicted, and was being tried for that offense. The proffered testimony which the district court refused to admit would have shown that on two other occasions he had been positively identified and charged with the commission of a similar offense in two different states, California and Arizona, to-wit: as an individual calling himself "Earl Albert Boyd" using vehicle title certificates stolen from Idabel, Oklahoma, to sell stolen vehicles. The testimony would have also shown that both the California and Arizona charges had been dismissed for "insufficient evidence." In fact, not only was Holt so identified, but on the day he allegedly committed the crime in California he was in custody of federal officials and present at a proceeding before the United States Commissioner in Oklahoma City.

In the words of Judge Bell:

"The proffered testimony went beyond a mere showing that appellant had *twice* previously *been charged* with similar crimes and that the *charges had been dismissed.* It tended to show, or at least was sufficient to permit the jury to draw an inference, that appellant had been the victim of mistaken identity in the Arizona and California cases, and that the cases had been dismissed for that reason. *Witnesses* in both states had *positively identified* appellant as the guilty party. In both sales, ownership of the stolen automobiles had been established by using stolen Idabel, Oklahoma, title certificates, and in Arizona, the name Earl Albert Boyd had been used. [Footnote: The record is unclear on whether this name was also used in California.] In each case, prosecution was discontinued. The jury might have inferred that this was because of insufficient evidence as to identity." *Holt*, at 166 (Emphasis supplied)

In the instant case, Jackson was never positively identified as the perpetrator of the assault upon the Boyds and accompanying couple in Marshall. As has already been shown, Boyd only testified that Jackson ". . . looked like him (meaning their assailant)," while none of the other three even identified him as a "possible suspect." But all four subsequently identified Lewis at his trial as their assailant. Jackson was never charged with that offense; Lewis was the only person charged, indicted and tried. We are not faced with a fact situation wherein an individual has been positively identified and charged, the charges having been subsequently dismissed, on two previous occasions as an individual who was selling stolen automobiles in several states using title certificates stolen from the same small town in Oklahoma.

The only similarity in the instant case and the offense for which Lewis was tried and convicted is that a rape of a white woman was committed by a black man while holding her at gunpoint. Jackson was not charged with the offense committed by Lewis, nor was he *positively* identified by anyone as the perpetrator of that offense. He was only identified ". . . as a possible. . . ." The only evidence given by Boyd was that they were abducted at gunpoint by a black man and their wives subsequently raped. There was no testimony from Boyd nor was there any other evidence that a robbery, shooting or stabbing occurred during the commission of Lewis' offense. Nor was any such evidence elicited from Lewis. In fact, Lewis was not questioned by appellant's counsel in the presence of the jury concerning the offense related to by Boyd.

Furthermore, even if it could be said that *Holt* is persuasive, the error, if any, was harmless. Such a question was considered and dismissed in *Holt* because the question of his identity was so close and because, not only was identification made through photographs some thirteen months after the transaction for which he was being tried, but also because his alibi testimony was supported by the testimony of his wife and an Oklahoma contractor whom he had been with and was supported by documentary evidence.

The question of identification in the instant case is not close. Only a review of the victims' testimony and the "incredible" testimony of John L. Lewis, as well as the identification testimony of the victims, is all that is necessary to show that appellant was not harmed. If there was any similarity in appearance between Lewis and Jackson, the jury would have observed it as both men testified before the jury. The jury heard Lewis testify that he and not appellant committed the attack on J_____ and Talley. Both victims made positive identification of appellant, both denied that Lewis was their attacker. It was shown that Lewis had nothing to lose by confessing to the commission of the offense. He was already serving five life sentences, one of which had been commuted from death.

Viewing the "totality of the evidence", the inescapable conclusion which must be reached is that Jackson was not prejudiced by the trial court's refusal to admit Boyd's testimony.

**364**

This case presents a similar situation to that in *Florio v. State*, 532 S.W.2d 614 (Tex. Cr.App.1976), although the majority attempts to distinguish *Florio*, saying that "there had been no misidentification in the other offense, nor was the identity of the offender in the other offense established." In the instant case there was no positive misidentification, only one of four victims in another unrelated incident saying appellant was ". . . a possible. . . ."

The judgment should affirmed.

ONION, P. J., joins in this dissent because the failure to admit Boyd's testimony was harmless error.

### DISSENTING OPINION ON MOTION FOR REHEARING

DOUGLAS, Judge.

The majority denies leave to file the State's motion for rehearing without written opinion. It holds that the refusal to admit the proffered testimony of Boyd concerning an unrelated offense at a remote time and at a different place is reversible error. It does so apparently on the question of identity or mistaken identity of appellant by the prosecutrix even though Boyd did not testify in the present case.

Boyd was present at a lineup in Dallas and the substance of his testimony would have been that Jackson, appellant, was possibly the man who committed a robbery and rape near Marshall. Lewis, in his trial at Marshall, could have cross-examined Boyd about this on the question of mistaken identity. But what relevance does it have in the present case as to whether the prosecutrix and her roommate could identify Jackson as the rapist? The majority is allowing the admission of evidence concerning an extraneous offense of another defendant in a separate case.

In admitting extraneous offenses offered by the State on the question of identity to rebut the defense of alibi, the majority requires that there must be similarities as to how the offenses were committed and that they were committed by the defendant be-fore they are admitted. The similarities are not present in the case at hand.

Would the majority hold on the question of identification where alibi has been raised as it has been in this case that the evidence that an offense was committed some 150 miles away by someone who possibly looked like an accused to be admissible? A good rule of evidence works both ways. What would be the relevancy of such evidence in the example given? It would be just as relevant as the proffered testimony the majority uses to reverse this case.

What happens in another case against another defendant is not admissible. There is no showing why it should be admissible in this case.

The motion for rehearing should be granted and the judgment should be affirmed.

ONION, P. J., joins in this dissent.