**Anthony Leroy PIERCE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69777.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 13, 1989.

---

Anthony P. Griffin, Galveston, Mary Conn and Ronald G. Mock, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Roe Morris, Gaynelle Jones, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative find-ings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of intentionally causing the death of Fred Eugene Johnson during the course of committing and attempting to commit aggravated robbery. Appellant raises twelve points of error. He argues that one venireman was improperly excused for cause based on his bias against imposition of the death penalty. He argues that three other veniremen should have been excused for cause because of their inability to differentiate between "intentional" in the guilt/innocence stage and "deliberate" in the punishment phase. He argues that he should have been allowed to exercise his peremptory challenges retroactively. He argues that an architect's reconstruction of the lineup was erroneously excluded from evidence. He argues that expert testimony concerning the unreliability of eyewitness testimony was improperly excluded. He argues that, on three occasions, evidence concerning a prior misidentification of the appellant was improperly excluded. Finally, he argues that the jury should have been given a special instruction during the punishment phase concerning the use of mitigating evidence. We affirm.

On August 4, 1977, Fred Johnson, the deceased, was working as manager of a Church's Fried Chicken restaurant. Brenda Charles was working as a cook and cashier that night, and Ron Cooks was working as a cook. After 9:00 that night, appellant entered the restaurant, approached the cashier, exhibited a gun, and demanded money from Johnson. Johnson put the money into a Church's chicken box and handed the box to Johnson. Appellant ordered the employees to lie on the floor. As appellant began to leave the restaurant, he dropped the box, spilling the money. He instructed Cooks to pick up the money. After Cooks had done this, appellant returned to the counter and told the deceased that he had been "laying to kill" him, and then shot the deceased. After this, appellant fled the store.

At trial, Charles testified that she recognized the appellant as the man who robbed and killed Johnson. In addition, she testified that she recognized appellant as a person who had been in the restaurant in the two months prior to the offense. Cooks also identified appellant as the man who robbed Johnson. Reginald Sanders, a twelve-year-old boy who observed the robbery through the front window of the store as he was passing by, testified that appellant was the man he saw committing the offense in the store and then running from the restaurant.[1]

In his eighth point of error, appellant argues that the trial judge erred in excusing venireperson Helen Scott for cause. Appellant contends that Ms. Scott equivocated in her position that she could not answer all of the special issues "yes" because of her moral opposition to the death penalty. The State responds that Ms. Scott conceded that a person who does wrong should be punished, but maintains that she consistently expressed the view that *she* could not answer the special issues in such a manner that the death penalty would be imposed.

The voir dire examination began with the trial judge asking a few questions concerning the venireperson's feelings about the death penalty and how they would affect her ability to serve as a juror.

> THE COURT: Now, if you are a juror in a capital murder case and in the first part of the trial you had found a person guilty of the offense of capital murder and after listening to all of the evidence in the second part of trial as well you were now convinced by all of the evidence beyond a reasonable doubt that each one of those questions [special issues] should be answered "yes," would you answer those questions "yes" knowing that it would result in the imposition of the death sentence?
>
> MS. SCOTT: Do you really want the truth?
>
> THE COURT: Yes, ma'am.

MS. SCOTT: I don't think I could.

During the State's examination of Ms. Scott, she acknowledged that there might be circumstances which would merit the death penalty, but she stressed that she would not want to impose it.

> Q: [By MS. JONES, Prosecutor]: Okay. So the question then is whether you have conscious or moral scruples against [the death penalty], you're saying to me that you couldn't do it, therefore, you do have such scruples against the death penalty in a proper case. You're saying no, you couldn't do it?
>
> A: Okay. But in other words, if it had to be done and I didn't have to do it, you know, I still say if you do wrong you should be punished; but I just don't want to be involved in it.
>
> \* \* \* \* \* \*
>
> Q: Now, when you say you have these feeling against the death penalty, I want to find out if that would apply to every kind of capital murder case. If you had a situation, as far as your own ability to get involved in it, if you had a situation where you had the most brutal capital murder case you could ever think about, and, Mrs. Scott, I'm not talking about anything in this case. Now, we can't talk about this case here. But let's say you had a situation w[h]ere [sic] a man has gone out and you learn that he has killed, went to a nursery school, went in there and just went wild and just killed every single baby in the nursery school.
>
> Now, that man, you find out later, had killed some other people before, gone to the pen, and gotten out and then robbed somebody and went to the pen and gotten out and now he's out killing all these babies. He could be charged with a capital murder. If you were on the jury coming in involved in that case in light of your own personal feelings about capital murder, would

1. Because appellant does not challenge the sufficiency of the evidence, it is unnecessary to discuss the facts of this case in detail.

you not—would you be able to sit on a jury in that case?

A: I know that's wrong and I think I understand what you're talking about, but it's just something about taking a person's life that it had been taught to me all my life and I just can't do it.

Eventually, the prosecutor asked Ms. Scott about how her feelings would affect her service as a juror.

Q: [By MS. JONES: A "yes" answer by all 12 jurors on both or all of the [special issues] means death as far as the Judge has no alternative and that's how the decision is made far as what the jury's involvement is. Do you understand that?

A: Huh, huh.

Q: Now, you've told us of your very strong beliefs on the death penalty and I'm asking you now that if you were serving—let's say you ended up for some reason on a jury on the capital murder case and you got to the punishment stage. You're given these questions to look at. Would you say to yourself because of your own opinions and beliefs that I don't care what the State has brought on these questions and, of course, the State has to try to convince you beyond a reasonable doubt to answer those questions yes. And let's say the State has brought evidence into here that really convinces you that those questions should be yes. Would you say to yourself, "If I say yes, he's going to get death. I'm morally opposed to it, consciously opposed to it, so I'm going to say no regardless of the situation just so he does not get death." Would you do that?

A: Yes, I would.

Q: Okay. Would you do that in every situation you can think of, every possible capital murder case, the most brutal one, for example, the man with the babies and so forth?

A: Yes.

Next, the prosecutor extensively explained the second special issue to Ms. Scott. After Ms. Scott said that she felt that she could answer the question in the abstract, the prosecutor put the question into terms of a capital case.

A: [By MS. JONES:] What I mean by "I couldn't live with my conscience," I mean just like I said. I mean that if a person—you can pretty near look at some people and talk to some people and tell if they're going to change or if there's anything about them that will change. Then if they're not going to change, well, it's just no hope for them.

Q: My question is a little more narrow than that. And if you feel it is yes and you know it's yes, but you know that that yes will mean that the Judge will sentence him to death, will you go ahead and say yes or will you not?

MR. GRIFFIN [Defense attorney]: Objection. Giving her—leading her toward the answer and also it is repetitive. We've gone over it four times now.

THE COURT: Overruled.

Q: [By MS. JONES:] You can answer?

A: I don't know, really.

THE COURT: Ma'am, I'm sorry to do this, but the "I don't know," the "I'm not sure," the "I think," are what is giving us problems. Please answer yes or not. Now, do you remember the question?

MS. SCOTT: Yes, I remember the question. I would say no.

At this point, the State challenged Ms. Scott for cause based on her inability to answer the special issues. The judge withheld ruling until the appellant examined the venireperson.

Next, appellant's attorney attempted to rehabilitate Ms. Scott. He stressed the civic importance of serving as a juror and the fact that the jurors serve under oath to follow the law. Neither of these arguments caused Ms. Scott to retreat from her position that she could not answer the special issues in such a way that a death sentence would be imposed. Appellant's attorney also presented a hypothetical case in which the facts of the capital offense were brutal and the defendant had a terrible criminal record. Not even this hypothetical situation could persuade Ms. Scott

that she could answer all of the special issues in the affirmative.

■ A juror should be excused for cause if he is unable to apply all facets of the law applicable to the case. For instance, if a venireman has conscientious objections to the imposition of the death penalty that would prevent him from following the judge's instructions, he may be excused for cause on motion by either party. E.g., *Bennett v. State*, 742 S.W.2d 664, 674 (Tex. Cr.App.1987); *McCoy v. State*, 713 S.W.2d 940, 952–53 (Tex.Cr.App.1986). The degree to which a juror must oppose the death penalty, in order to be excused for cause, was set out by this Court in *Bennett*:

> In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that in order for a juror to be subject to a challenge for cause based upon that juror's views on the death penalty, the record must show that the juror's views would prevent or substantially impair the performance of his or her duties in accordance with the oath taken and the trial judge's instructions. The Supreme Court also indicated that reviewing courts were to give due deference to the trial court's decision given its position to gauge the juror's sincerity and demeanor.

*Bennett*, 742 S.W.2d at 674. Thus, the question here is whether the trial judge abused his discretion in finding that Ms. Scott could not honestly answer the special issues because of her beliefs.

■ The venireperson was definite in her statements that she could not answer the special issues in accordance with the evidence, and cross examination failed to shake her from her position. The trial judge did not abuse his discretion in excusing Ms. Scott for cause. Appellant's eighth point of error is overruled.

In his ninth, tenth, and eleventh points of error, appellant argues that three veniremen should have been excluded for cause because they could not make an independent determination concerning the first special issue, Art. 37.071(b)(1) V.A.C.C.P., after finding at the guilt/innocence phase that the murder was committed intentional-

ly. Appellant argues that such a juror must be excused for cause upon timely and proper motion. Art. 35.16(c)(2) V.A.C.C.P. The State makes no real challenge as to appellant's statement of the law. Instead, the parties have differing characterizations of the challenged veniremen's testimony. Thus, we will briefly state the relevant law governing these points of error and then separately examine the testimony of each venireman.

Generally, the standard for determining whether a potential juror should be excused for cause, based on an inability to follow the law, is whether the juror's beliefs would prevent or substantially impair him from following the law as set out in the trial judge's instructions and as required by the juror's oath. *Cockrum v. State*, 758 S.W.2d 577, 592 (Tex.Cr.App. 1988); *Sharp v. State*, 707 S.W.2d 611, 620 (Tex.Cr.App.1986). The specific question in the instant case is whether the challenged veniremen would answer the first special issue based on the evidence before them, rather than merely relying on their finding of an intentional killing in the guilt/innocence phase of the trial. See *McCoy v. State*, 713 S.W.2d 940, 951 (Tex.Cr.App. 1986). Finally, in determining whether the trial judge erred in refusing to excuse a juror, we must examine the record as a whole and decide whether the judge abused his discretion. In doing so, this Court must show great deference to the trial judge's ruling because, unlike us, he was able to observe the juror's demeanor and vocal inflection in answering the questions. E.g., *Cockrum*, 758 S.W.2d at 587; *McCoy*, 713 S.W.2d at 945.

In appellant's ninth point of error, he argues that venireman Richard Piotrowski stated that he would automatically answer the first special issue in the affirmative because he would have already found appellant had committed an intentional murder. Because of this, Piotrowski should have been, he argues, excused for cause.

All testimony relevant to this point of error occurred during appellant's cross-examination of the venireman. That testimony states, in relevant part:

Q: [By MR. GRIFFIN:] You have to have a felony, a robbery plus an intentional or knowing murder and I'm interpreting what you've told me, you've told me that under that circumstance if I find it to be intentional or knowing then that person should pay by the ultimate penalty and that should be death.

A: Except that the law says we've got to make these considerations [the special issues].

Q: And we'll go to that. Let's deal with your opinions first, then we'll go to the law.

A: All right.

Q: Your opinion is they should pay the ultimate penalty, that being death?

A: No, not necessarily.

Q: Let's go to the law.

A: My opinion is based on these criteria which defines in my mind pretty much what the ultimate penalty ought to be based on.

MR. GRIFFIN: May I approach the witness, Your Honor?

THE COURT: You may.

Q: Earlier when you explained to me your position, you dealt with these issues.

A: Okay.

Q: Okay. Is that not correct?

A: Yeah.

Q: Okay. And you say that in answering Issue No. 2 [sic: 1] the deliberate and reasonable expectation that the death of the deceased or another would result. In answering those issues—

A: Okay.

Q: —you said that if I've gotten to the point that it is an intentional or knowing capital murder, committed it deliberately and with the reasonable expectation that the death of another would result, I would have to answer that yes because I didn't see any notion of sudden passion. I didn't see any notion of criminal [sic] negligent homicide. I didn't see any of that, therefore, I would have to answer that yes.

MR. MORRIS [Prosecutor]: We object.

A: Yeah.

MR. MORRIS: He's never said that.

MR. GRIFFIN: He just answered yes in the record.

THE COURT: Sustained.

Q: Sir, did you answer the question yes?

A: If I understood the question.

\* \* \* \* \* \*

Q: And after you have listened to that testimony [at the guilt/innocence stage] and if you've gone through that deliberation and after your deliberation have found that that person did a capital murder intentionally and knowingly—

A: Okay.

Q: —and if you don't see any evidence of sudden passion, any evidence of reckless [sic], any evidence of negligence and when you get to this stage of the trial dealing with the Issue No. 1, when you look at Issue No. 1 whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result, you would have to answer that one yes based upon the consideration and the deliberation you went through in the first part of the trial, is that correct, and that's what you answered?

A: If I had done just what you suggested there.

Q: Sure.

A: But that doesn't mean I would have answered No. 1 yes unless I had gone through that.

Q: Through that process?

A: Yeah.

Q: If you've gone through that process —I'm assuming—I'm going to be honest.

A: All right.

Q: I'm assuming by my question that you have gone through that process.

A: Okay.

Q: That you've sat down and you've looked at the evidence and you found

someone guilty of an intentional or knowing capital murder.

A: All right.

Q: And if my assumption is correct that's when you would answer it yes, is that correct, Issue No. 1?

A: Presuming that those were the facts in the case, yeah.

Q: Sure.

A: Okay.

THE COURT: Just a minute. To be sure that the Court and any Appellate Court understands, what exactly do you mean, what facts in the case are you referring to, sir?

THE PANELIST: The evidence.

THE COURT: At what phase?

THE PANELIST: During the punishment phase.

\* \* \* \* \* \*

Q: Okay. And what I'm saying is—is that if in fact you found that ultimate intentional or knowing felony, a felony plus capital murder—excuse me.

A: Okay.

Q: If you in fact, you found that and when you get to Issue No. 1 you've already told me you would answer that yes. Now what the confusion is at this point is that when—and what I'm trying to do, I'm mixing them up a little bit—that's the only time that you can see in your mind when you would answer this Issue No. 1 no is that when you have that negligence, when you have that sudden passion, when you have that reckless [sic], that's the only time you can see that that could be answer no?

A: That's not right.

Q: Okay. Explain to me why.

A: Because they are not the same thing. You're talking apples and oranges.

Q: Can you tell me why?

A: Well, this is done during the punishment phase.

\* \* \* \* \* \*

Q: If you got to Issue No. 1 and you dealt with Issue No. 1, you found him intentionally or knowingly committing a murder, you said it twice or three times that you would answer that question yes if you found it was an intentional, knowing capital murder, that is correct, isn't it?

A: Say that again, would you, please?

Q: Okay. If you got to Issue No. 1.

A: All right.

Q: You've gone through the deliberation the guilt/innocence stage of trial.

A: Okay.

Q: You've told me at least three times that if I am now in the punishment stage of trial dealing with deliberate and reasonable expectation of death—

A: Okay.

Q: —I would have to answer that yes.

A: Based upon—

MR. MORRIS: Your honor—

\* \* \* \* \* \*

MR. MORRIS: My objection is to counsel introducing into his question that you have already told me this three times. I object to that because there is no showing that this juror or prospective juror has told him any such thing.

Q: Have you told me three times, sir?

A: I'm not sure what we answered to, but I didn't think I was answering your question. I was answering my question.

THE COURT: The objection is sustained.

\* \* \* \* \* \*

A: And so we're—I'm not basing Issue No. 1 or the finding or the issue of No. 1 on the process of going through these lesser charges [at the guilt/innocence stage]. We would have to look at Issue No. 1 based on the evidence.

\* \* \* \* \* \*

Q: Let's talk about if you commit a murder you should pay and what you've said is, yeah, that's generally true and that if you commit a capital murder and if I found it's been intentionally and knowingly done you should pay with your life and you said yes, I agree with that.

Now what I was—where we stopped at and where the confusion arose at is when we got to the Special Issue No. 1. Would you agree with me on that?

THE COURT: Counsel, if you are going down the same path, we have applied and reapplied this. It is repetitions. Please move on.

MR. GRIFFIN: Your Honor, I think I'm entitled to inquire of Special Issue No. 1. I think that in terms of Adams, in terms of Witherspoon, in terms of various decisions, the answers have been ambiguous in terms of the Code of Criminal Procedure. I think we're entitled to inquire in terms—in regard to the particular venireman's position and that's all I'm doing, Your Honor. I'm not plowing down the same path. The venireman told me one thing one time and something else the other time.

THE COURT: You have suggested that several times, Counsel, but he has not confirmed it, not one time.

■ The only instance in which the venireman indicated that he would automatically answer the first special issue affirmatively was a "yes" answer to a long and convoluted question posed by appellant. The record reflects that the venireman was confused by the question and did not intend to indicate that he would tie his deliberations at guilt/innocence to answering the special issues. Other portions of the record clearly indicate that the venireman perceived the question of "deliberateness" to be separate from that of "intentional conduct." Cf. *Cockrum*, 758 S.W.2d at 587. The trial judge did not abuse his discretion by refusing appellant's motion to excuse Mr. Piotrowski for cause. Appellant's ninth point of error is overruled.

In his tenth point of error, appellant argues that the trial judge erred by refusing to excuse venireman Lawrence Gillespie for cause. Appellant contends that the voir dire examination of Gillespie revealed that he would automatically answer the first special issue "yes" upon a conviction of capital murder. The relevant testimony is set out below:

Q: (By Mr. Griffin) What I have intepreted [sic] you to tell me, that if, in fact, there is a finding of an intentional or knowing killing, if you got to Issue No. 1 and the question becomes whether it was deliberate and with reasonable expectation that the death of another would result, then you would answer that question "yes;" and I was getting ready to add something to that. If there's nothing in the record to show sudden passion, to show negligence, to show reckless [sic] or anything of that nature, if it was intentional, then in your mind that answer should be "yes?"

A: That's right, yes.

After receiving this answer, appellant challenged the venireman for cause. Without ruling on the motion, the trial judge passed the venireman to the State for further examination.

Q: (By Ms. Jones) Mr. Gillespie, we're talking now about answering Special Issue No. 1. Having found the defendant in the guilt stage guilty of an intentional capital murder, are you saying you would automatically answer Special Issue No. 1 "yes"? I don't mean in the hypothetical case he's given you; but as you recall, we talked about several different kinds of possible capital murder cases.

Are you saying that in every possible situation if you found them guilty of an intentional capital murder in part one, stage one, you're going to automatically answer in stage two—

A: No, I did not.

Q: Okay.

A: He posed a set of circumstances that based on what he described, I would have judged that deliberate. If that was the question, which it never got asked, no, one does not necessarily follow the other one.

Q: And you're going to make an independent judgment as to answering Special Issue No. 1, whether it was committed deliberately and with reasonable expectation, outside of the one

you made when you looked at if it was an intentional capital murder?

A: Yes, I will.

MS. JONES: Pass the witness.

MR. GRIFFIN: Just a couple of questions.

Q: (By Mr. Griffin) I know you will make an independent judgment; but under the circumstances where there's an intentional—going back to what we're talking about—you find it was intentional or knowing.

Getting to the first issue that deals with deliberate and reasonable expectation, if there ain't no finding in the first part of sudden passion and all of that, then your opinion still remains the same?

A: I'm still not sure I understand your question.

MS. JONES: Objection.

THE COURT: Overruled.

Q: Let me go back.

A: Okay.

Q: I recognize that you said you will make an independent finding on Issue 1.

A: Right.

Q: But what you've told me previously before I passed you still remains the same concerning the intentional and knowing finding in the first stage; is that correct?

A: I'm lost now.

Q: Well, let me back up.

A: We're talking about two things. One is guilt, and the other is punishment.

Q: Let me back up.

A: Okay.

Q: Tell me if I'm right or wrong.

A: All right.

Q: First you told me that if you're in the first stage of the trial and you've listened to the facts on any hypothetical capital murder case and if you found that that person committed that offense intentionally or knowingly and let's say you found that person guilty of capital murder, found that the person intentionally or knowingly commit-

ted an offense of murder in the process of, let's say, a robbery. I gave the example of a robbery. You've now solved that issue. You've passed the first point in the trial.

A: I understand.

Q: Now, if you were to go to the second point of the trial and if I understand what you're telling me, if you were dealing with Issue 1 in terms of deliberate and reasonable expectation that the death of another would result, if you were to deal with those issues, if you were to relate back to the first part of the trial and if there's no evidence that there was sudden passion, negligence or reckless—

A: Okay.

Q: —then what you've told me previously—and what I'm trying to get you to do is reaffirm what you said—is that if there's no evidence of sudden passion, reckless [sic] or negligence, then you would answer this question "yes" because you found this intentional or knowing, deliberate act in the first part of the trial?

A: I think I'm going to have to say "yes" because as I read this question, if—let me back up, too. You said that I found that he did it deliberately and intentionally?

Q: Intentionally or knowingly.

A: If I said that once, why am I going to change my mind the second time? Is that really what we're talking about?

Q: That's what I'm asking you about.

MR. GRIFFIN: I pass the witness.

THE COURT: Sir, we have had an insertion of "deliberately" into the—

THE PROSPECTIVE JUROR: He put those words, not me.

A: (By the prospective juror) But if that were the case, if I thought the first time he did it deliberately and intentionally, then when you came back and asked me again, "Do you think he did it deliberately and intentionally," I would—

Q: (By Mr. Griffin) Insert the words "intentionally" or "knowingly." What

I'm saying, in the first part of the trial, you have found in this part of the trial intentionally or knowingly has committed an act.

A: Now, let's back up. If I understood the original question—

THE PROSPECTIVE JUROR: Can I?

THE COURT: You may.

A: (By the prospective juror) I thought there was a thing where we could find him guilty of capital murder.

Q: (by Mr. Griffin) Okay.

A: Number one, guilty of the act.

Q: Sure.

A: And then we would try and decide whether he did it knowingly, deliberately, talking about this issue?

Q: Sure.

THE COURT: Let him finish.

A: (By the prospective juror) You have put in my mouth that I agreed the first time in the guilt part that I believe the evidence showed he did it deliberately or knowingly. Well, yeah, if you said that's what I concluded, then I'm going to concluded [sic] the same thing the second time around.

Q: Let's use the words "intentionally" and "knowingly."?

A: What are you trying to say?

Q: If you found it was intentionally and knowingly in the first part of the trial —we're back to that issue—absent sudden passion, reckless [sic], or negligent, if you found intentionally or knowingly in the first part fo [sic] the trial and if you got to the second issue of deliberately in the second part of the trial, as I understand it—and tell me if I'm putting words [in] your mouth—your answer would be "yes"?

A: Let me say—

\* \* \* \* \* \*

THE COURT: You had requested the opportunity to reread the question. Do you have any comments now?

THE PROSPECTIVE JUROR: No, because as I look at this, it's a two-part thing. You can't do one without the other and based on the words that you were using—I'll preface that with "if," right?

Q: (by Mr. Griffin) Sure.

A: If that was my decision that he did it knowingly and deliberately and knew this was going to happen, that's what I felt the first time, why would I change it the second time? That's not saying based on what I heard before that the act could have been committed with varying little circumstances.

\* \* \* \* \* \*

THE COURT: Assume that you have passed the guilt or innocence stage. You found a person guilty of the offense of capital murder. In every case, the automatic answers to those questions are "no." The State must sustain its burden of proof to you beyond a reasonable doubt by legal evidence that those questions should be answered "yes."

So, unless there is evidence sufficiently on the first part to allow you to answer the second question may not be present. The point is: Would you consider all of the evidence and not automatically answer any question "yes," especially the first question "yes," simply because you have found a person guilty of the offense of capital murder rather than holding the State to building up to it?

Would you automatically say it should be answered "yes" and require a building down or would you require the State to build its evidence up?

THE PROSPECTIVE JUROR: I would require the State to build its evidence.

THE COURT: Challenge denied.

█ Here, the venireman gave apparently contradictory answers concerning whether he would make an independent determination on the first special issue. When read as a whole, the record reflects that the venireman, at times, labored under the misapprehension that, in order to convict appellant for capital murder, he must find that appellant acted "deliberately." This mistaken belief caused appellant to state that he would automatically answer the first special issue "yes." When the sentencing procedure was explained apart from specified factual settings and without

the mistaken belief that the guilt/innocence and punishment phase of trial would both require a determination of deliberateness, the venireman stated that he would answer the first special issue in accordance with the evidence presented. On this record, the trial judge did not abuse his discretion by refusing to excuse the venireman. Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant argues that the trial judge erred by refusing to excuse venireperson Donna Hawkins for cause. Appellant contends that Hawkins' testimony revealed that she would automatically answer the first special issue "yes" if she found that appellant committed an intentional murder. The relevant portions of her testimony are set out below:

Q: [By Ms. Jones] We have the same burden of proof in the second stage of the trial with respect to these Special Issues that we have in the first stage. Let's talk about deliberate. Let me give you some examples. You could have an aggravated robbery, say of a convenience store, a 7 Eleven. The man goes into the 7 Eleven, takes a gun to the clerk, "Give me your money," and then says, "You look like you—I don't like the way you look," takes the money and shoots her. One situation.

Second, the man puts a gun on her, takes the money, tells her to get in the cooler. As he leaves he hears a noise. He turns around to stop the clerk, shoots into the floor. The bullet ricochets and strikes the clerk and she dies.

Third situation. Goes into the same 7 Eleven, robs her, and this time to keep her from moving he shoots her foot, later on she bleeds to death and dies.

Fourth situation. Two people rob a 7 Eleven. The gunman goes in while the look-out guy stays at the door with a gun looking out. The gunman goes over to the clerk, takes the money says, "You need to be killed," and kills her. The look-out man never sees her or fires a gun at her, and they leave.

Now, I submit in those four hypothetical situations that in looking—you could find each one of those individuals guilty of capital murder, an intentional aggravated robbery wherein a person dies. However, in answering the second part in the second stage of the trial when you start looking at Special Issue No. 1, that one could give different answers in each of those cases.

By that I'm indicating that simply because you found them guilty of an intentional capital murder doesn't mean that you automatically answer Special Issue No. 1 that it was deliberate. You'll have to look, I suggest to you, at each situation in finding whether or not the conduct of the defendant was deliberate. Are you following me in following those examples?

A: Yes, ma'am.

Q: And would you then hold the State to its burden of proof in Special Issue No. 1 and although you found him guilty of an intentional capital murder, you won't automatically start off with "yes" to that, but wait until we've shown you by evidence beyond a reasonable doubt that that question should be answered "yes"?

A: I do.

Q: Do you see in your mind the difference between the word "intentional" and the word "deliberate"?

A: Yes, ma'am.

Q: Obviously the second part of that, which is the reasonable expectation of death would occur in my examples is where the one shot in the foot and dies of the ricocheted bullet. You could see how those examples could cause different answers in Special Issue No. 1. Any questions?

A: No, ma'am.

*    *    *    *    *    *

Q: [By Mr. Griffin:] The intentional killing of a person during the course of a robbery constitutes capital murder. And under those types of hypotheticals and under those circumstances what you told me was that if you found

what is the intentional killing of a person during the course of a felony and if there is no showing of recklessness or negligence or sudden passion, then death is appropriate. You would vote death under those circumstances and you would vote life under other circumstances where they show recklessness, negligence or sudden passion?

A: Yes, I would.

Q: And part of that vote is based on your strong beliefs in how you view society and the deterrence factor?

A: Yes.

MR. GRIFFIN: Thank you, Your Honor. We would pass the witness for purpose of challenge.

Q: (By Ms. Jones) Ms. Hawkins, you understand that in our capital murder law you will have—once you make a finding in the first stage that it's an intentional capital murder, you then have to answer the issues, the Special Issues that we talked [about] a minute ago. Are you saying that if you found that the defendant is guilty of capital murder in the first stage of the trial the before you even look at any Special Issues you're going to automatically vote "yes" because you found that it was an intentional capital murder or are you—

THE COURT: Let her answer that question please.

THE WITNESS: I feel that I would look at all of the issues, but there are certain things like what you were talking about earlier the distinguishing in the difference of like an accidental shooting and all this. I would look at thing like that—I don't know what I'm trying to say. I would look at all of the issues, but I do distinguish between an intentional murder and an accidental sort of thing too. And the example that the defending attorney gave to me was an intentional sort of murder and murder is murder and it's not right.

BY MS. JONES:

Q: Okay. I think the question we're trying to determine is whether or not you will look at—in the second part of

trial where you've got Special Issues to answer, are you going to look at all of the evidence you heard in the first stage of the trial and are you going to automatically, because you heard in the first stage of the trial that it was an intentional killing, are you going to automatically answer those questions "yes" or can you conceive of a situation where you'll have certain evidence in the second part of the trial where you can answer those questions "no"?

A: I could.

Q: So then would you automatically answer it "yes"?

A: No, depending on the situation. Attorneys can make things look like a certain way and then the other attorney can make things look like another way. I would weigh all of the evidence.

                *    *    *    *    *    *

Q: (By Mr. Griffin) I have a few questions. As I understand what you're telling me, the examples that you understand Ms. Jones to have given deal with those other types of offenses or may deal with those other types of offenses like sudden passion, accident, or recklessness?

A: Yes, sir.

Q: But when you're dealing with an intentional killing, then that's when murder is murder and it's just not right and death should occur, the death penalty is proper?

A: It depends on the other circumstances as well. Even though it is murder—if we get to Issue No. 2 where they would be a continuing threat to society, I do believe that the death penalty should be enforced.

Q: And what you're saying—and I don't think we disagree, I'm just trying to clarify it—you did say—what you're saying is if there is those other factors, such as sudden passion or recklessness or negligence, then under those circumstances, sure, life may be appropriate. But if there's an intentional killing, then death is appropriate in the whole deterrence factor that

we're talking about, deliberate act deterring factor. Is that what you're talking about?

A: Yes, sir.

MR. GRIFFIN: Pass the witness.

The venireman, at first blush, appears to vacillate between saying she would automatically vote "yes" and saying that she would consider the evidence. A closer examination of her testimony, however, reveals that it actually falls within the scope of testimony found not to be excusable in *McCoy*, 713 S.W.2d at 951. In *McCoy*, we stated:

> [T]the testimony of prospective juror Pilcher shows that she did initially state that she could not envision a situation where she could answer the first special issue "no" if the defendant had already been found guilty. She later indicated that she would not automatically vote "yes" to the first special issue. Simply because a juror is unable to conceive of a or envision a situation wherein he or she would respond "yes" or "no" is not automatically grounds for reversal.

*Id.*

■ Ms. Hawkins's testimony presents a situation analogous to that in *McCoy*. Hawkins repeatedly stated that she would answer the first special issue in accordance with the evidence. When she stated that she would answer the issue "yes," her answer was invariably in response to hypothetical situations. Thus, even though neither of the attorneys nor Ms. Hawkins could provide a situation in which she would answer the first special issue "no," her answers clearly indicated that she would base her answer on an examination of the evidence rather than as an automatic response to her verdict at the guilt/innocence stage. The trial judge did not abuse his discretion by refusing to excuse the venireperson. Appellant's eleventh point of error is overruled.

In his seventh point of error, appellant argues that he should have been allowed to exercise his peremptory challenges at the completion of *all* individual voir dire examinations rather than at the end of *each* individual examination. He argues that the voir dire procedure would be more fair if peremptory challenges were to be exercised at the end of the proceeding and that the proceeding would more closely resemble the voir dire process for non-capital crimes. The State responds that we need not address the merits of appellant's claim because he cannot demonstrate harm as required by *Sanne v. State*, 609 S.W.2d 762, 767–68 (Tex.Cr.App.1980). In addition, the State argues that the statutory scheme for capital cases is proper, given the unique problems involved in the selection of a capital jury.

In *Sanne*, 609 S.W.2d 762, the defendant presented an equal protection challenge to the different procedures for exercising peremptory challenges in capital and non-capital cases. Without reaching the merits of the defendant's claim, we held that the defendant failed to show any harm from the alleged error. *Sanne* established two ways in which a defendant may show harm:

> We will describe two methods that could have been used to show the harm required to preserve this constitutional challenge for review. On the one hand, a defendant may choose to *use* a peremptory challenge to exclude a prospective juror while claiming he should have the right to reserve the strike until after the entire venire has been questioned. In such a case, harm would be shown by use of all peremptory challenges, denial of a request for additional peremptory challenges, and the seating of a juror upon whom the defendant would have exercised peremptory challenge. This rule allows correction of any error by giving the defendant an extra peremptory challenge for use against the venireman the defendant would have stricken if given a choice between him and the venireman against whom a peremptory had already been used.

> \* \* \* \* \* \*

> On the other hand, a defendant may, as [this defendant] did with respect to two veniremen, join the issue by *declining to use* a peremptory challenge to exclude a prospective juror while claiming he should have the right to reserve

the strike. In such a situation, the defendant must show that at the end of the examining the venire, he made a retroactive request to exercise his peremptory challenges in the manner to which he claims he is entitled.

*Id.* at 767–68.

■ Here, appellant filed a pretrial motion to exercise his peremptory challenges at the end of the voir dire. This motion, however, did not meet the requirements set out in *Sanne* for preservation of error. In addition, appellant did not refer to this motion at the time he exercised his peremptory challenges, nor did he in any way continue to assert that he should be able to exercise his peremptory challenges at the end of the process. Because of these two failures, appellant failed to "show harm," i.e. preserve error, in the first manner set out in *Sanne.*

Appellant never availed himself of the second manner of preserving error, refraining from exercising a peremptory challenge and asserting a right to exercise the challenge at the end of voir dire.

We, therefore, do not reach the merits of appellant's equal protection claim because appellant failed to preserve error, as required by *Sanne, Id.* at 767–68. Appellant's seventh point of error is overruled.

In his first point of error, appellant argues that the trial judge erred in excluding the testimony of and exhibits prepared by Ken Austin on grounds of relevance. Mr. Austin is an architect and, based on a police description of the heights and weights of the people who appeared in a lineup with appellant, Austin made a drawing to approximate the appearance of the lineup. In addition, Austin was to testify about how the sizes of objects surrounding another object will affect our perception of the first object's apparent size. Austin prepared two additional drawings to illustrate the operation of this principle.[2] For purposes of analysis, we will divide this evidence into two types. First, we will discuss the drawing of the lineup, defense exhibit 19. Second, we will discuss the substance of Austin's testimony and the drawings illustrating the effect of relative size on perception, defense exhibits 17 and 18.

Appellant argues that Tex.R.Crim.Evid. 702 serves to make both Austin's testimony and exhibits admissible. The rule states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Appellant contends that Austin's credentials established him as an expert in scale drawings and that his testimony could assist the jury in judging the suggestiveness of the lineup in which appellant was identified. The State responds that Austin admitted that he had no specific expertise as to criminal lineups, had based his drawing entirely on the basis of hearsay police reports (the accuracy of which he could not determine), and that he did not know if his drawing accurately depicted the lineup as it actually appeared.

■ In order for a drawing or photograph to be admitted as evidence, the proponent of the item must be able to prove that the depiction is an accurate representation of what it purports to depict. E.g., *DeLuna v. State,* 711 S.W.2d 44, 46 (Tex. Cr.App.1986); see also Tex.R.Crim.Evid. 401; S. Goode, G. Wellborn & M. Sharlot, *33 Texas Practice Guide to the Texas Rules of Evidence: Civil and Criminal* § 401.5 (1988) (The adoption of new Rules of Criminal Evidence has made no change in the predicate required for admission of photographs and drawings.) Here, there was no testimony that defense exhibit 19 accurately portrayed the lineup that it sought to depict. In fact, Austin testified that he could not make such a representation because he did not personally observe the lineup. Because the predicate was not laid for admission of the drawing, the trial

---

**2.** The trial judge heard appellant counsel's examination of Austin out of the jury's presence before ruling that the evidence was inadmissible.

judge correctly excluded defense exhibit 19.

While appellant's reliance on Rule 702 was misplaced in regard to exhibit 19, it is dispositive as to all other aspects of Austin's testimony and his drawings. The threshold determination for admitting expert testimony is whether the "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Tex.R.Crim.Evid. 702. The drafters of Fed.R.Evid. 702, which is identical to our Rule 702, explained this determination in their official comment to this rule.

> Whether the situation is a proper one of the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918.

Fed.R.Evid. 702 advisory committee's note. We agree with this characterization of the rule.

■ Austin testified that he had specialized knowledge regarding drafting, scale drawings, and the use of perspective to create the illusion of three dimensions in a two-dimensional drawing. Specifically, Austin testified that when an object is placed near a large object, the object will be perceived to be smaller than its actual size, and vice versa. Without determining whether this knowledge might be useful in understanding other evidence or resolving a disputed issue of fact, we do not believe that this insight represents specialized knowledge that was not possessed by the jurors. Thus, Austin's testimony, and the drawings designed to assist him in testifying, did not fall within the scope of Rule

702 and were properly excluded. Appellant's first point of error is overruled.

In his second point of error, appellant argues that the trial judge erred in excluding expert testimony concerning the inherent unreliability of eyewitness identifications. Appellant called Dr. Ira Bernstein, a professor of psychology at The University of Texas at Arlington, to testify as an expert. After establishing his credentials, Bernstein testified that cross-racial identifications are less reliable than identifications within a single racial group; that daily exposure of a witness to a racial group will not necessarily improve the accuracy of cross-racial identifications; that when a witness believes that the culprit is in a lineup, he becomes more likely to make an identification, even if the person identified does not match his original description; that the presence of a gun tends to divert a witness's attention in such a way as to reduce the reliability of the identification; that witnesses tend to want to please the police by making a positive and definitive identification; and that people are good at remembering faces but are poorer at remembering the context in which they have seen the face. On cross-examination, the State established that Dr. Bernstein had not examined any witnesses in the instant case and could not say which of the factors that he dicussed would be applicable and, if applicable, to what extent they would undermine the witnesses' testimony.

Appellant argues that Tex.R.Crim.Evid. 702 broadly defines expert testimony. He maintains that because Dr. Bernstein's testimony would assist the jury in evaluating the eyewitness testimony in this case, it should have been admitted. The State counters by citing *Hopkins v. State*, 480 S.W.2d 212 (Tex.Cr.App.1972), and its progeny, for the proposition that psychological evidence may not be admitted for impeachment purposes and that three Courts of Appeals have specifically applied *Hopkins*, to this type of expert testimony. *Thomas v. State*, 748 S.W.2d 539 (Tex.App.—Houston [1st] 1988); *Welch v. State*, 677 S.W.2d 562 (Tex.App.—Eastland 1984); *Burke v. State*, 642 S.W.2d 197 (Tex.App.—Houston [14th] 1982). Although we agree with the

State's position that exclusion of this evidence was not error, we decline to base our decision on our earlier holding in *Hopkins,* 480 S.W.2d at 212.[3]

The proper standard for admission of expert testimony was set out in the immediately preceding point of error. Thus, if Dr. Bernstein possessed "specialized knowledge [that would] assist the trier of fact to understand the evidence or to determine a fact in issue," then the evidence should have been admitted. Tex.R.Crim. Evid. 702. Although this Court has never addressed the admissibility of expert testimony concerning eyewitness identifications within the scope of Rule 702, several federal appellate courts have. E.g., *U.S. v. Downing,* 753 F.2d 1224, 1226–27 (3rd Cir. 1985), on remand 609 F.Supp. 784 (E.D.Pa. 1985), aff'd without opinion 780 F.2d 1017 (3rd Cir.1985); *U.S. v. Purham,* 725 F.2d 450 (8th Cir.1984); *U.S. v. Thevis,* 665 F.2d 616, 641–42 (5th Cir.1982), reh. denied 671 F.2d 1379, *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *United States v. Fosher,* 590 F.2d 381, 382–83 (1st Cir.1979); *U.S. v. Watson,* 587 F.2d 365 (7th Cir.1978), *cert. denied sub. nom. Davis v. United States,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979); *U.S. v. Brown,* 540 F.2d 1048 (10th Cir.1976) *cert. denied,.* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *U.S. v. Amaral,* 488 F.2d 1148 (9th Cir.1973). All circuits are in substantial agreement[4] as to the reasons why it is not an abuse of the trial judge's discretion to exclude this type of testimony. We will discuss the reasoning set out in a representative federal case and rely on it as the basis of our decision here.

In *Amaral,* 488 F.2d at 1148, the Ninth Circuit Court of Appeals was faced with a trial judge who excluded expert testimony very similar to that of Dr. Bernstein. That Court began by noting that expert testimony must be helpful to the jury in order to be admissible. See ante discussion of appellant's first point of error. The Court next discussed some of the concerns inherent with any expert testimony, such as delay, the likelihood that the jury will abandon its responsibility of weighing the credibility of witnesses, and the possibility that the expert testimony is not rooted in a sound scientific basis. See *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Finally, the Court examined the ways in which cross-examination may be used to expose the weaknesses in eyewitness testimony. Declining to conduct an analysis under the *Frye* test, the Court found that a jury is amply qualified to make a determination on the credibility of eyewitnesses, aided by cross examination and common knowledge of memory and its effect on perception. When the jurors' ability to make credibility determinations without the assistance of expert guidance is coupled with the problems attendant to expert testimony, the Court held that the trial judge did not abuse his discretion by excluding the testimony from evidence. *Amaral,* 488 F.2d at 1153–54. In the instant case, we do not need to determine whether such a hearing was necessary because the trial judge heard Dr. Bernstein's testimony. Thus, unlike *Downing,* we may limit our inquiry to whether or not the trial judge abused his discretion.

■ All of the factors cited by the Ninth Circuit in *Amaral* are also present here. In addition, Dr. Bernstein testified that he had no specific knowledge concern-

---

**3.** *Hopkins* was decided long before adoption of our present rules of evidence. Thus, our broad holding in *Hopkins* that psychological evidence is inadmissible for impeachment purposes is somewhat in doubt given the breadth of Rule 702. This change in the evidentiary rules, however, does not imply that the narrow holding in *Hopkins* was necessarily incorrect. See *Hopkins,* 480 S.W.2d at 221 (Morrison, J. concurring and dissenting).

**4.** *U.S. v. Downing,* 753 F.2d at 1224, unlike all of the other federal cases cited in this paragraph, does not take the position that it was not error for the trial judge to exclude the expert testimony. Instead, *Downing* required the trial judge to conduct a hearing as to the evidence's admissibility. At this hearing, the judge was to hear the proposed testimony, determine whether the testimony was based on reliable scientific principles that would assist the jury, weigh the potential that the evidence would unfairly prejudice or confuse the jury, and to see how closely the expert testimony would "fit" the eyewitness testimony in that case. *Id.* at 1226.

ing the testimony of the witnesses in this case. This failure to "fit" his testimony to the evidence in this trial further reduces the likelihood that the jury would have been measurably aided by Dr. Bernstein's testimony.[5] We hold that the trial judge did not abuse his Appellant's second point of error is overruled.

In his third point of error, appellant argues that the trial judge erred by refusing to admit the indictment from a case in which appellant was accused of robbery and charges were later dropped because appellant was in jail at the time the offense was committed. In this other case, the Steinruck robbery, the complainant identified appellant as the man who robbed him at his service station. Because appellant was misidentified in this prior case, appellant sought to introduce the circumstances of that offense in order to discredit the eyewitness testimony in this case and to add credence to his claim that he had been misidentified in the instant case. In the instant case, at appellant's behest, Steinruck testified to the basic facts of the robbery, that he picked appellant out of a lineup, and that he was still convinced that appellant was the culprit. The trial judge allowed Steinruck's testimony under the theory that it showed a prior misidentification of appellant.

Appellant argues that the indictment should have been admitted to show that the State gave Steinruck's story at least enough credence to seek an indictment against appellant. The State counters that none of Steinruck's testimony was relevant under *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972) and Tex.R.Crim.Evid. 401. Second, the State argues that the trial judge complied with the concerns expressed in *Jackson v. State*, 551 S.W.2d 351 (Tex.Cr.App.1977).[6] We examine the

State's second contention, that the indictment was not relevant.

Contrary to appellant's characterization of the State's cross-examination of Steinruck, the State did not attack Steinruck's credibility. The State first established that Steinruck had no knowledge concerning the instant offense. Next, the State elicited facts to show that Steinruck had less opportunity to observe the man who robbed him than the witnesses in the instant case. Finally, the State elicited testimony that the man who robbed Steinruck had a different hair style than did appellant at the time of the lineup.

The State never pursued a line of questioning to establish that Steinruck intentionally testified untruthfully. In fact, all parties seem to agree that Steinruck's identification of appellant was a mistake. Therefore, the accuracy of Steinruck's identification was not at issue, and the State did not dispute any portions of Steinruck's testimony that he was robbed or that it was appellant that he identified. That the State initially believed Steinruck's identification would tend to vouch for the reliability of his identification. Because no one contended that Steinruck's identification was correct, there was no benefit to appellant in proving that the State initially believed Steinruck. This Court, in *Jackson*, 551 S.W.2d at 351, did not hold that a copy of the indictment, if one exists in the misidentification case, is relevant. Appellant's third point of error is overruled.

In appellant's fourth and fifth points of error, he argues that the trial judge erred in refusing to admit evidence concerning the amount of time it would take to travel from the site of the Steinruck robbery to the site of the instant offense. The fourth point of error concerns testimony concern-

**5.** In this case, we do not hold that expert testimony concerning eyewitnesses should be excluded in *all* cases nor confused with a situation in which a party complains when such testimony *is* admitted into evidence. See *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986).

**6.** In *Jackson*, we reversed the defendant's conviction because there was significant evidence that the crime for which the defendant was convicted was committed by another person. The defendant was not allowed to introduce evidence that he had been previously misidentified as that other person. Here, evidence of misidentification was admitted. Appellant's prior indictment, however, was not relevant to prove that another person might have committed the instant offense. Thus, the holding in *Jackson* is not applicable.

ing the time it would take to drive that distance. The fifth point of error concerns a videotape depicting the drive between the two points.[7] Appellant contends that the proximity of the two crime scenes suggests that the crimes were committed by one person. The State agrees that testimony concerning the Steinruck robbery is relevant, but argues that the time it would take to travel the distance was irrelevant because the second offense occurred approximately one month after the first. Testimony concerning the distance between the two crime scenes was admitted into evidence.

■ We agree with the State's position. Evidence that the two crimes occurred near each other has some probative value that the crimes were committed by one person. Because the crimes were committed a month apart and a hypothetical actor committing the two offenses would not have gone directly from one scene to the next, the travel time was irrelevant. Appellant's fourth and fifth points of error are overruled.

In his sixth point of error, appellant argues that "[t]he trial court erred and violated the defendants [sic] right to due process and the right of confrontation by disallowing the defense from recalling a police officer that said defendant had reserved the right to recall." After twice cross-examining officer Bonds[8], appellant attempted to recall the witness during the defense's case-in-chief. The State objected to the relevancy of the testimony that appellant sought to elicit from the witness. The trial judge excused the jury, and appellant questioned the witness. After this testimony was heard, the trial judge ruled that it was irrelevant. Appellant excepted to the ruling and offered the testimony taken out of the jury's presence as a bill of exception.

Appellant contends that this ruling denied him of his right to confrontation and cites *Spain v. State,* 585 S.W.2d 705 (Tex. Cr.App.1979). The State responds that the record does not support appellant's contention because appellant was, in fact, allowed to recall the witness. Second, the State argues that appellant's rights to due process and confrontation were not violated because appellant had ample opportunity to cross-examine the witness.

■ The State's first argument, that the record does not reflect the factual basis for appellant's point of error is incorrect. The State's position is that because appellant was technically able to recall the witness, that he was not denied any right. However, the ability to question a witness outside the jury's presence does not satisfy the requirements of a defendant's right to confront witnesses. See *Spain,* 585 S.W.2d at 710. Thus, the State's contention is without merit.

■ The fact that appellant's examination of Officer Bonds would not satisfy appellant's right to confrontation does not however, establish that the appellant's right to confrontation was implicated. The cases cited by appellant in this point of error[9] and other related Supreme Court cases[10] primarily address the ability to conduct meaningful cross-examination. Here, appellant conducted a full cross-examination of Officer Bonds. The record reflects no instances in which appellant was denied an avenue by which to attack the witness's credibility, and appellant's brief makes no such assertion. Thus, appellant's constitutional right to confrontation was not implicated by the trial judge's ruling concerning the direct testimony of Bonds.

7. The videotape also included depictions of the crime scene in the instant case. These portions of the tape were admitted into evidence and do not bear on any point of error.

8. Bonds was initially called by the State. Appellant cross-examined the witness after direct examination and then again after redirect examination. Later, the State recalled Bonds. Again, appellant cross-examined the witness after direct and redirect examination.

9. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *Hurd v. State,* 725 S.W.2d 249 (Tex.Cr.App.1987); *Spain,* 585 S.W.2d at 705.

10. E.g., *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

Appellant characterizes this point of error as being of constitutional dimension, however he fails to argue specific theories of why certain testimony was relevant and what "substantial rights" were implicated.[11] See Tex.R.Crim.Evid. 103(a); Tex.R. App.Pro. 74(d); Tex.R.App.Pro. 210(b); and discussion of appellant's twelfth point of error, *post.* Appellant's sixth point of error is overruled.

In his twelfth point of error, appellant argues that the trial judge erred by refusing to give the following, requested instruction:

> You are hereby instructed that you can consider all mitigating circumstances in regards to the punishment of the defendant herein. Mitigation will not be defined for you; but you may consider the age, race, background, sex, history, and all matters related to this defendant that have been put before you.

The State responds that *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1989), held that no such instruction is ever required.

 Rather than reach the merits of appellant's contention and the State's response, we find that appellant's point of error inadequately sets out a reviewable point of error. "A point [of error] is sufficient if it directs the attention of the appellate court to the error about which complaint is made." Tex.R.App.P. 74(d).[12] Appellant's brief fails to cite what, if any, mitigating evidence was before the jury. In addition, appellant fails to argue how the special issues failed to allow complete consideration of mitigating evidence. . See *Penry v. Lynaugh,* 489 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256, (1989).[13] Such a failure to cite to relevant portions of the record and set out the legal theory on which appellant rests his contention means that nothing is presented for review. E.g.,

*Green v. State,* 682 S.W.2d 271, 292 (Tex. Cr.App.1984); *Hawkins v. State,* 613 S.W.2d 720, 735 (Tex.Cr.App.1981); *Love v. State,* 533 S.W.2d 6, 9–10 (Tex.Cr.App. 1976); *Dabbs v. State,* 507 S.W.2d 567, 569 (Tex.Cr.App.1974). Appellant's twelfth point of error is overruled.

Having considered the appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

CLINTON, J., believing the Court's treatment of appellant's twelfth point is entirely too restrictive and having serious reservations about others, joins only the judgment of the Court.

TEAGUE, J., dissents.

---

**11.** Had appellant's right to confrontation been implicated, no such inquiry would be necessary. *Spain,* 585 S.W.2d at 710.

**12.** Tex.R.App.Pro. 74(d) is made applicable to capital punishment cases on direct appeal before this Court by Tex.R.App.Pro. 210(b).

**13.** The central issue in *Penry* is whether there was mitigating evidence before the jury that could not be given consideration within the existing framework of the special issues. *Penry,* 489 U.S. at ——, 109 S.Ct. at 2935.