In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00346-CR
NO. 09-24-00347-CR
NO. 09-24-00348-CR

_____

**AUDEL VILLAFUERTE-MORA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause Nos. 23DCCR0052, 23DCCR0053 and 23DCCR0054**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Audel Villafuerte-Mora ("Appellant" or "Mora") in three trial causes: in 23DCCR0052, for evading arrest or detention; in 23DCCR0053, for tampering with or fabricating physical evidence; and in 23DCCR0054, for possession of a controlled substance, namely cocaine. The cases

were consolidated for trial.[1] Appellant pleaded not guilty to all three charges, but the jury found him guilty as charged in the indictments. After a hearing on punishment, the jury assessed punishment at ten years in each case, with the sentences to run concurrently. On appeal, Appellant raises three issues, arguing that the trial court erred by admitting certain evidence. We affirm.

## Evidence at Trial

### Testimony of Officer Ethan Kahla

Officer Ethan Kahla testified that he worked for the Port Arthur Police Department at the time of trial, he previously worked for the Baytown Police Department, and on January 6, 2022, he was working for the Chambers County Sheriff's Department. Kahla recalled that on January 6, 2022, he was on duty and driving a marked patrol unit, when about noon on that day, he was conducting traffic enforcement on IH-10 eastbound near the Trinity River bridge in Wallisville, Texas, in Chambers County. Kahla testified that he saw a gray Chevy Trax drive by that had no license plate, which is a violation of the Transportation Code, and Kahla tried to catch the vehicle. According to Kahla, once he got near the Chevy, Kahla turned on his overhead lights, and the Chevy pulled over. Kahla testified that the driver of

---

[1] Appellant was also charged with a fourth offense—aggravated assault on a peace officer—that was tried along with the other three charges, and the jury found Appellant not guilty of the fourth offense. We discuss the fourth charge only as necessary herein.

the Chevy did not use a turn signal when pulling over. Kahla recalled that after the Chevy pulled over and stopped, Kahla got out of his vehicle and began walking up to the Chevy, but the Chevy "took off." At that point, Kahla went back to his vehicle and pursued the Chevy.

Kahla identified State's Exhibit 1 as a Google map with notations on it that depicted the area "[t]owards the end of the pursuit," and he agreed it would assist the jury in understanding his testimony. The defense objected because "there's writing on it. It's not a true Google map. There's personal writing on it and also explanations," and said it would be fine to write on the map after Kahla's testimony. The State told the trial court that it would have Kahla testify first, and the trial court sustained the defendant's objection.

Kahla testified that the chase of the Chevy went through Chambers County, the Chevy exited IH-10 multiple times to the feeder road, and the Chevy eventually exited at Hamshire Road going southeast. Kahla described Hamshire Road as a road with "multiple turns[.]" According to Kahla, the Chevy driven by the defendant made a U-turn near the Hamshire volunteer fire department, it crossed back over the interstate, and shots were fired from the vehicle. Kahla agreed that at some point, a firearm and an extended magazine of ammunition were tossed from the Chevy. According to Kahla, the chase ended when Kahla used his patrol vehicle to crash into and disable the Chevy.

3

Kahla agreed that the route of the chase, the location where things were thrown from the Chevy, and the location where the Chevy ultimately stopped were shown on State's Exhibit 1 and there was writing on the exhibit. The defense objected and took Kahla on voir dire. On voir dire by the defense, Kahla testified that the writing on State's Exhibit 1 was not his own but rather was the prosecutor's writing, and Kahla had gone over the exhibit together with the prosecutor. The defense objected to Exhibit 1 because Kahla was not the author. The prosecutor stated, "that's not the predicate. It just needs to be fair and accurate and will assist as a diagram will assist the jury to understand his testimony." The trial court overruled the objection and admitted State's Exhibit 1. Below is a copy of Exhibit 1.



State's Exhibit 1

Kahla identified State's Exhibit 2 as a "blown up" copy of Exhibit 1, and he agreed it would assist the jury in understanding his testimony. The defense objected that it was not a Google map but rather "a map made by somebody that is not superimposed over the Google" map offered as Exhibit 1. The State responded that Exhibit 2 was a diagram, and the trial court overruled the objection.

Referring to Exhibit 2, Kahla testified that the arrows on the map indicated the direction of travel during the chase. According to Kahla, the map indicated that the chase started going eastbound on IH-10 from Chambers County into Jefferson County, then the Chevy exited IH-10 to Hamshire Road going southeast, then took a U-turn and doubled back on Hamshire Road, crossed over IH-10, and the chase of

5

the Chevy ended in Chambers County. Kahla testified that after the driver of the Chevy made the U-turn, spike strips were used, but the spike strips were unsuccessful. Kahla also testified that shots were heard coming from the Chevy, and he indicated on the map about where a magazine was thrown from the car. Based on the distance of the pursuit and the failure to stop despite multiple opportunities to do so, Kahla thought that the driver of the Chevy was intentionally trying to evade arrest or apprehension. Kahla recalled that the chase lasted "[o]ver 16 minutes[]" and at times the speed reached "approximately 120, 130 miles an hour."

Kahla also testified that a bag and a digital scale were tossed out of the Chevy "around the middle of the pursuit." According to Kahla, most of the time, digital scales are used to weigh narcotics or drugs. Kahla recalled that he was directly behind the Chevy during the chase, and he saw shots fired from the Chevy, he thought the gunfire was aimed directly at him, and he felt in fear for his life. Kahla testified that he fired back through the windshield of his patrol vehicle. According to Kahla, his gunfire did not end the pursuit, and he had to use his vehicle in a "pit maneuver[]" to crash into the Chevy and disable it. At one point, Kahla saw the driver of the Chevy laughing, and after disabling the Chevy, Kahla saw "furtive movement from the front area of the vehicle[,]" as though the driver was reaching for something. According to Kahla, after the chase ended, the driver of the Chevy

had blood coming from his nose. Kahla identified the defendant as the person driving the Chevy that day.

Kahla recalled that multiple other officers and EMS assisted in taking custody of the defendant. Kahla identified State's Exhibit 3 as a video recorded from his dash camera and his body camera on the day of the chase and the recordings were admitted into evidence and published to the jury. Kahla testified that based on what he experienced during the chase, he concluded that the defendant was trying to take Kahla's life or someone else's to help evade or escape from law enforcement. Kahla also believed that when the defendant threw the firearm or magazine out of the car window that he was trying to prevent law enforcement from finding it. Based on his experience and training, Kahla testified that someone might drive a vehicle without a license plate so that the driver's "criminal activity can't be linked back to him." Kahla also testified that a person might use a firearm with a filed-off serial number so "it can't be linked back to him if it's used in some type of criminal activity."

Testimony of Officer Jordan Kalis

Officer Jordan Kalis testified that at the time of trial, he was working for the Mont Belvieu Police Department, and he previously worked for the Chambers County Sheriff's Department. Kalis recalled receiving a radio transmission on January 6, 2022, at about 12:18 p.m. that Officer Kahla was involved in the pursuit of a vehicle. Kalis testified that he joined Kahla in pursuing the vehicle after he heard

7

shots fired on the radio. Kalis testified that he arrived at the location where the pursuit ended after the suspect was in custody, and he was assigned to go look for the handgun that was thrown from the vehicle on Hamshire Road, east of IH-10. According to Kalis, he found a silver firearm with a black handle in a ditch. Kalis identified State's Exhibits 5 through 8 as photographs of the area where he found the firearm and photographs of the firearm. Kalis testified that the firearm pictured in Exhibit 8 was a Colt 1911 Gold Cup Trophy, and he could not read a serial number because it "look[ed] like it was attempted to be removed." Kalis further testified that he and other officers located a scale used in weighing drugs and narcotics near IH-10.

Testimony of Deputy Robert Betar

Deputy Robert Betar testified that he works for the Chambers County Sheriff's Department and that on January 6, 2022, he was asked to search for an item with his K9 partner, Stark. Betar recalled that the search was on Hamshire Road, and it was thought that a magazine or a firearm had been thrown out on the side of the road. According to Betar, Stark alerted to the scent of something in the ditch, and "[h]e found the spring[] that goes inside the magazine." Betar identified State's Exhibits 9 through 12 as photos of the area where he and Stark searched that day. Betar agreed that one of the photos depicted a magazine with the bottom gone, it was empty, and Betar agreed the magazine was an extended magazine or round that was a bit larger than normal.

8

Testimony of Sergeant Robert Hemmenway

Sergeant Robert Hemmenway testified that he worked for the Mont Belvieu Police Department at the time of trial, and he was working with the Chambers County Sheriff's Department on January 6, 2022, as a Lieutenant over the Covert Investigations Unit. Hemmenway recalled that shortly after noon on that day, he was notified that two officers in his unit were involved in a pursuit on IH-10. Hemmenway testified that he followed the pursuit to Hamshire Road, and he set up "stop sticks" or spikes in the road at a curve in the road, but the suspect went around the stop sticks. According to Hemmenway, before he could remove the stop sticks so other officers would not be hurt, the suspect started shooting. Hemmenway identified State's Exhibit 7 as a photo of him holding a pistol that the suspect tossed from his vehicle. Hemmenway testified that the serial number of the firearm had been filed off. According to Hemmenway, one reason a serial number would be filed off is if the "[s]uspect doesn't want the gun to be able to be traced back to him if it's [] used in a crime."

Testimony of Detective Donald Webster

Detective Donald Webster testified that he worked for the Chambers County Sheriff's Office, and on January 6, 2022, he received a notification shortly after noon about a high-speed chase. According to Webster, he helped collect evidence after the high-speed chase ended. He agreed he searched the suspect's vehicle, where he

9

found suspected narcotics and about $5,000 in cash. Webster testified that $5,000 in cash, a digital scale, and narcotics was "indicative of drug trafficking." Webster also testified that "Interstate Highway 10 is a drug trafficking corridor[.]"

Webster identified State's Exhibits 13 through 19 as photos taken of the defendant's vehicle on January 6, 2022, and some of the photos depicted "a clear plastic baggy containing a white powdery substance[]" that Webster believed was cocaine. Webster identified State's Exhibit 4 as a Texas Department of Public Safety ("DPS") lab report for the suspected cocaine, and he testified that the report reflected that the substance found in Mora's vehicle "tested positive for cocaine, 1.06 grams." On cross-examination, Webster testified that the video of the pursuit of Mora depicted a plastic baggy thrown out while Mora was driving on the interstate, but that baggy was not recovered.

Ranger Joshua Benson

Ranger Joshua Benson testified that he had been a State Trooper and was a Ranger at the time of trial. He agreed that on January 7, 2022, he assisted in processing a vehicle that was connected to a high-speed chase. Benson testified about what he found:

> During the processing of that vehicle, we discovered unfired cartridge cases or live -- what we call live rounds, .45 caliber. We also discovered .45 caliber cartridge cases that had been fired, as well. We found a -- we believe to be a marijuana joint inside the vehicle, as well. And then we found three projectiles from [] the officer's firearm.

10

Benson recalled that the items that were found were released to Rangers Joe Haralson and Joseph Dreaden to submit to the DPS Crime Lab for analysis. Benson identified State's Exhibits 20 through 24 as photos of the inside of Mora's vehicle and the items found. He also testified that two sets of Illinois license plates were found inside Mora's vehicle, which Benson testified could be due to the owner getting new plates or because "someone's involved in nefarious activity[.]" Benson recalled that there was a backpack in the vehicle but no luggage.

Ranger Joseph Dreaden

Ranger Joseph Dreaden testified that on January 7, 2022, he was involved in collecting or consolidating evidence in this case and submitting it to the lab, which included a Gold Cup firearm case, a "plantlike substance" and seeds, three .45 caliber cartridges, three bullets, swabs from various locations on the vehicle, a Samsung phone, an iPhone, and cartridges and casings from Deputy Burk's vehicle and Officer Kahla's patrol car. Dreaden agreed he took these items to the Chambers County Sheriff's Office.

Detective Christopher Detorre

Detective Christopher Detorre testified that he worked for the Chambers County Sheriff's Office, and he was also assigned to the DEA as a task force officer. He recalled that on January 6, 2022, he received a call shortly after noon that Officer Kahla was in pursuit of a vehicle. Detorre testified that he, Lieutenant Hemmenway,

11

and Detective Webster joined the pursuit and laid spike strips down. Detorre recalled hearing gunshots during the incident. According to Detorre, after the pursuit ended, he was assigned to try to find a firearm the officers believed Mora had thrown from his car during the pursuit, and a firearm was found in a ditch. He also recalled that he found a scale in the area where Mora had been seen throwing things out of his car, and Detorre testified the scale was a type "commonly used to weigh narcotics." Detorre also recalled that other officers found a baggy of suspected cocaine, a key fob, and $5,000. According to Detorre, two phones—a Samsung and iPhone—were also taken into evidence. Detorre testified that the evidence collected that day was indicative of narcotics trafficking.

Testimony of Nicole Groshon

Nicole Groshon testified that she is a forensic scientist in the firearm and tool mark section of the DPS Crime Laboratory in Houston. Groshon testified that bullets and cartridge cases have tool marks made by a firearm that can be used to tie them to that firearm. She agreed it is possible to restore a serial number of a firearm that has been obliterated by using certain reagents and magnets to re-etch the surface. Groshon identified State's Exhibit 27 as a 45ACP caliber Colt model Gold Cup pistol with a restored serial number of GCT44507. Groshon testified that she test-fired the firearm, and she concluded that the six cartridge cases provided to her for

analysis were fired from the Colt pistol. On cross-examination, she agreed that the serial number of the pistol matched a case that was confiscated at the scene.

Testimony of Bryan Strong

Bryan Strong testified that he works for the DPS Crime Laboratory in Austin as a supervisor for the friction ridge section and as a forensic scientist in the friction ridge field. He explained that "friction ridge" refers to latent prints and the skin on the underside of fingers, hands, toes, and feet. He agreed that it is possible to make an identification of a latent print by comparing it to a known inked print from a person. Strong identified State's Exhibit 32 as a copy of a latent print found on a magazine that was submitted to his lab and Exhibit 31 was a copy of fingerprints obtained from Mora and obtained from the DPS database. After examining the ridge features of the prints in Exhibits 31 and 32, Strong concluded that Mora was the source of the print in Exhibit 32.

Testimony of Ranger Joe Haralson

Joe Haralson testified that he is a Texas Ranger employed with DPS, where he has worked for forty-three years. He agreed that he responded to the scene of a shooting on January 6, 2022, in Chambers County, west of Hamshire Road and north of IH-10. Haralson recalled that when he arrived, the suspect had been taken to the hospital, and he consolidated evidence that was collected at the scene by other Rangers. Haralson agreed that the evidence collected included a magazine spring, an

13

extended magazine, and a Colt 1911 Gold Cup Trophy handgun. Haralson recalled that the firearm's serial number had been obliterated. Haralson agreed that he interviewed the defendant four days after the incident, and Haralson did not believe that Mora looked like his nose had been shot. Haralson testified that his interview with Mora was recorded, he identified State's Exhibit 34 as a recording of the interview, and the exhibit was admitted and published to the jury. Haralson testified that, after interviewing Mora, Haralson formed the opinion that Mora had committed the offense of evading arrest and aggravated assault on a police officer. He also believed that if Mora threw the gun or magazine out of the vehicle to prevent officers from finding them, then Mora would have committed the offense of tampering with evidence.

In the interview,[2] Mora states he is from Aurora, Illinois. Mora told Haralson that he shot out of the car window during the chase to see if the weapon worked, and he did not shoot at anything or anyone in particular. Mora also said it was "stupid" and "not smart" for him not to stop when the police were chasing him, and he did not stop because he did not have a driver's license. Mora said he was not under the influence of alcohol or narcotics at the time. According to Mora, he did not have any

---

[2] For part of the interview, Mora spoke directly to Haralson in English, but part of the interview was conducted with the assistance of another Ranger who spoke Spanish. The defense did not object to the admission of the recording of the interview.

illegal narcotics in his car. Mora told Haralson that he threw the magazine out of the car because it did not work. Mora said that he started shooting because he felt in fear for his life. According to Mora, there were no license plates on his car because he forgot to put them on.

Mora's Testimony

Mora testified at trial. He stated that he grew up in Texas, but at the time of the incident, he lived in Aurora, Illinois. Mora testified that he had spent the night in Fort Worth or Dallas the night before, and he drove through Houston as he headed east towards Louisiana. At trial Mora told the jury he did not know why the license plates were not on his car. According to Mora, he drove off when the officer approached his vehicle because he thought the officer had "dismissed" him, although Mora agreed that the officer never talked to him. Mora testified that after the incident, when he was in the hospital, "they said the bullet fragment hit my nose, and that was a cause for [] neurosurgical treatment [which] means they're controlling my brain[.]" Mora testified that, even with numerous police vehicles following him, he did not stop because he did not "have control over [his] body. Nowadays with this new technology, you don't know who's controlling [you]. . . . They set me up. [] [T]he hospital is putting [] injections on people and trying to control them." According to Mora, he did not throw anything out of the car window. Mora testified that it was not him in the video, he did not shoot at a police officer nor attempt to

15

assault an officer, and he did not own the vehicle that he was driving. Mora also testified that he did not have drugs in the car.

The jury found Mora guilty of evading arrest or detention with a motor vehicle, tampering with physical evidence, and possession of a controlled substance. No additional evidence was admitted during the punishment phase. After closing arguments, the jury assessed punishment at ten years on each of the three charges, and the trial court determined that the sentences run concurrently. Mora timely filed a notice of appeal.

## Issues

In his first issue, Appellant argues that the trial court erred by admitting State's Exhibit 1 because it was an unauthenticated diagram and an out-of-court statement. In his second issue, Appellant challenges the admission of State's Exhibit 2—an enlargement of Exhibit 1—for the same reasons. In his third issue, Appellant argues that the trial court erred by admitting the testimony of Officer Kahla about what was on Mora's mind at the beginning of the incident because such testimony was mere speculation.

## Standard of Review

We review a trial court's ruling on the admission of evidence under an abuse of discretion standard of review. *See Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). "Under this standard, the trial court's decision to admit or exclude

evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Id.* (citing *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). "We may not substitute our own decision for that of the trial court." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). We uphold the trial court's ruling if it is correct under any applicable legal theory, even if the trial court gave the wrong reason for its correct ruling. *See Irsan v. State*, 708 S.W.3d 584, 616 (Tex. Crim. App. 2025) (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

If evidence is admitted in error, such error is nonconstitutional error and only requires reversal if the error affected the appellant's substantial rights. *Gonzalez*, 544 S.W.3d at 373. Nonconstitutional errors that do not affect an appellant's substantial rights must be disregarded. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Error affects substantial rights only if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Gonzalez*, 544 S.W.3d at 373.

State's Exhibits 1 and 2

Appellant's first and second issues challenge the admission of State's Exhibits 1 and 2. Appellant describes Exhibit 1 as

> a chart prepared out of court that related to the allegations contained in the indictment and extraneous offenses [and that] contained directional arrows, locations relative to the alleged chase, locations of inculpatory

17

evidence that was alleged to have been thrown out of the vehicle by appellant, and testimonial evidence such as "shots fired."

Appellant describes Exhibit 2 as "an enlargement of the same inadmissible evidence[.]" According to Appellant, both exhibits were inadmissible because they were "unauthenticated hearsay[.]" Appellant contends that the handwritten notes on the map rendered the exhibits inadmissible. Appellant argues that the officer (Officer Kahla) through whom the State offered the exhibits testified that he did not make any of the handwritten notations on the two map exhibits but rather that the prosecutor had put the writing on the exhibits.

In response, the State argues that (1) Appellant failed to properly preserve his arguments for appeal, and (2) Exhibits 1 and 2 were admitted as demonstrative evidence, which courts do not typically regard as inadmissible hearsay.

To preserve error for appeal, a party must make a timely and specific objection with the trial court that is specific enough to inform the trial court of the complaint, and the party must obtain a ruling on the objection (or object to a trial court's refusal to rule). *See Crawford v. State*, 710 S.W.3d 774, 685-86 (Tex. Crim. App. 2025) (citing Tex. R. App. P. 33.1(a)(1)(A), (2); *Ex parte Nuncio*, 662 S.W.3d 903, 914 (Tex. Crim. App. 2022)). To be sufficiently specific, an objection does not have to be "hyper-technical" or use specific, formalistic language, but the objection must be clear enough for the trial court to understand what the party wants and why the party thinks he is entitled to it. *See Ex parte Nuncio*, 662 S.W.3d at 914. A general or

18

imprecise objection may be sufficient to preserve error only if the legal basis is obvious to the trial court and to opposing counsel, which generally requires that statements or actions are documented in the record that clearly indicate what the trial court and opposing counsel understood the objection to be. *See id.* (citing *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)). In addition, the point of error raised on appeal must comport with the objection he made in the trial court. *See Clark*, 365 S.W.3d at 339 (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)). If the objection on appeal differs from that made in the trial court, the appellant has failed to preserve error. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

When the State first referred to Exhibit 1 at trial, Officer Kahla agreed it was a Google map with some notes on it, that the exhibit was a fair and accurate representation of the area it purports to represent, and that the exhibit would assist the jury to understand his testimony. The State tendered Exhibit 1 to the defense for inspection, and defense counsel stated, "the only thing I'm going to object to is there's writing on it. It's not a true Google map. There's personal writing on it and also explanations, and, so, I object." The trial court sustained the objection and responded that it would be appropriate after the deputy testified about the exhibit. Then, on direct examination by the State, Officer Kahla described his chase of Mora's vehicle and the route the chase took. Kahla agreed that the exits, turns,

19

approximate locations where items were thrown from Mora's car, and where Mora's car ultimately wrecked were noted on Exhibit 1. The State then offered Exhibit 1 into evidence. At that point, defense counsel took the witness on voir dire, during which Kahla agreed that the prosecutor had made the notations on the exhibit based on Kahla's description of what happened and where it happened. After the voir dire, the defense objected to Exhibit 1 because Kahla was "not the author" of the exhibit. The trial court overruled the objection and admitted Exhibit 1.

The prosecutor then asked Officer Kahla about Exhibit 2, and Kahla agreed that Exhibit 2 was a fair and accurate "blown up" version of Exhibit 1 and that Exhibit 2 would assist the jury in understanding his testimony. When the prosecutor tendered Exhibit 2, defense counsel objected as follows: "The only objection I have, Judge, is it's not a Google map. It is a [] map made by somebody that is not superimposed over the Google that he tendered as State's Exhibit No. 1 in front of the jury. That's my only objection." The trial court overruled the objection and admitted Exhibit 2. Later in the trial, the prosecutor told the trial court that the State wanted to withdraw State's Exhibit 2 from evidence, the defense had no objection, and the trial court withdrew the exhibit.

On this record, we conclude that Appellant did not raise a hearsay objection in the trial court as to Exhibits 1 or 2, and he did not preserve error as to that

20

challenge. *See* Tex. R. App. P. 33.1; *Wilson*, 71 S.W.3d at 349. Therefore, we restrict any further analysis to whether Exhibits 1 and 2 were sufficiently authenticated.

For evidence to be admissible, the offering party "must produce evidence sufficient to support a finding that the item is what the [party] claims it is." Tex. R. Evid. 901(a); *see also Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). The authentication requirement is a liberal standard of admissibility. *See Fowler v. State*, 544 S.W.3d 844, 848-49 (Tex. Crim. App. 2018) (citing *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)). Conclusive proof of authenticity is not required. *See id.* at 848. Evidence may be authenticated by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *See Tienda*, 358 S.W.3d at 638. The trial court need only make a preliminary determination that the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *See Fowler*, 544 S.W.3d at 849. It is up to the jury to make the final determination of whether the evidence is what the proponent claims it to be. *See Butler*, 459 S.W.3d at 600.

In the State's brief on appeal, the State suggests that the maps in Exhibits 1 and 2 were demonstrative exhibits. "Demonstrative evidence is evidence admitted for use as a visual aid or to illustrate a point, but it must meet the relevancy and materiality requirements imposed by Rule 403 of the Texas Rules of Evidence."

21

*Allen v. State*, No. 09-23-00316-CR, 2024 Tex. App. LEXIS 8142, at \*57 (Tex. App.—Beaumont Nov. 6, 2024, pet. ref'd) (mem. op., not designated for publication). "Visual, real, or demonstrative evidence, regardless of which term is applied, is admissible upon the trial of a criminal case if it tends to solve some issue in the case and is relevant to the cause that is, if it has evidentiary value, i.e., if it sheds light on the subject at hand." *Simmons v. State*, 622 S.W.2d 111, 113 (Tex. Crim. App. 1981) (panel op.); *see also Pugh v. State*, 639 S.W.3d 72, 84 n.12 (Tex. Crim. App. 2022). The proponent of a demonstrative exhibit must show that it is a fair and accurate portrayal of what its proponent claims it to be, and it may be authenticated by a witness's testimony because "the authentication of demonstrative evidence derives from its status as a 'fair and accurate representation of relevant testimony or documentary evidence otherwise admitted in the case.'" *Pugh*, 629 S.W.3d at 85 (quoting McCormick on Evidence § 214 (8th ed. 2020)). The accuracy of a demonstrative exhibit is not considered as a matter of authentication but as part of a trial court's weighing of the probative value of the exhibit against the danger of unfair prejudice. *Id.* at 85-86. The proponent must demonstrate that the evidence is relevant because it would assist the jury in understanding other real, testimonial, or documentary evidence. *Id.* at 86.

We have previously explained that "[i]t is proper and legitimate to introduce diagrams to explain and clarify the testimony of a witness." *Pitre v. State*, No. 09-

95-140 CR, 1997 Tex. App. LEXIS 3883, at *5 (Tex. App.—Beaumont July 23, 1997, no writ) (mem. op., not designated for publication). "Texas courts have not generally treated demonstrative evidence, such as a diagram, as inadmissible hearsay." *See Boudreaux v. State*, 631 S.W.3d 319, 336 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (citing *Pierce v. State*, 777 S.W.2d 399, 413 (Tex. Crim. App. 1989); *Clay v. State*, 592 S.W.2d 609, 613 (Tex. Crim. App. 1980); *Vollbaum v. State*, 833 S.W.2d 652, 657 (Tex. App.—Waco 1992, pet. ref'd)).

Here, Officer Kahla testified that Exhibit 1 was a fair and accurate representation of the area that it purported to represent, especially "the end of the pursuit[.]" Kahla testified about the locations and direction that he drove while chasing Mora's car. Kahla agreed that the location of the pursuit and where he believed Mora threw things from the car were noted on Exhibit 1 and that the prosecutor had written the notations on the map or exhibit. Kahla also testified that Exhibits 1 and 2 would assist the jury in understanding his testimony. The jury subsequently watched the video of Kahla's pursuit of Mora that was admitted as Exhibit 3. Appellant did not object in the trial court, nor does he object on appeal that Exhibits 1 and 2 were more prejudicial than probative under Rule 403. *See* Tex. R. Evid. 403. We conclude that the trial court did not abuse its discretion in concluding that the exhibits were properly authenticated. Officer Kahla's testimony established that Exhibits 1 and 2 were what the State claimed that they were and that

the exhibits would be helpful to the jury in understanding Kahla's testimony. *See* Tex. R. Evid. 901; *Pugh*, 639 S.W.3d at 85-86; *Simmons*, 622 S.W.2d at 113; *Pitre*, 1997 Tex. App. LEXIS 3883, at *5. To the extent that Appellant challenges the accuracy of the exhibits, a complaint that an exhibit is inaccurate goes to the weight of the evidence and not to its admissibility. *See Hanks v. State*, No. 09-23-00132-CR, 2024 Tex. App. LEXIS 6748, at *43 (Tex. App.—Beaumont Sept. 11, 2024, pet. ref'd) (mem. op., not designated for publication) (citing *Robinson v. State*, 739 S.W.2d 795, 802 (Tex. Crim. App. 1987) (en banc); *Hasley v. State*, 786 S.W.2d 733, 735 (Tex. App.—Beaumont 1989, pet. ref'd)). Finding no error, we overrule Appellant's first and second issues.

Kahla's "Speculative Testimony"

In his third issue, Appellant argues that the trial court erred by admitting the "speculative testimony" of Officer Kahla about what was in Appellant's mind at the beginning of the incident—specifically, testimony that Appellant may have been driving a vehicle without a license plate to prevent his alleged criminal activity from being traced to him. According to Appellant, Kahla's testimony allowed the State "to set the stage for its theory of an alleged crime spree[.]" Appellant argues that Officer Kahla could not possibly have known what was in Appellant's mind in failing to have a proper license plate on his car.

Specifically, Appellant challenges the following questioning at trial:

24

[Prosecutor]: . . . In your training and experience, why would someone travel down the interstate without a license plate or what is one of the reasons why they do so?

[Defense counsel]: Objection, Your Honor. It calls for speculation in reference to driving without a license plate.

[Prosecutor]: I'm asking about in his training and experience, Judge.

The Court: Overruled.

[Prosecutor]: In your training and experience.

[Kahla]: To attempt to make it to where his criminal activity can't be linked back to him.

[Prosecutor]: What is an LPR, or license plate reader for the benefit of the jury?

[Kahla]: It's a tool used by law enforcement to track the movement of vehicles along major highways.

[Prosecutor]: Any idea if there are license plate readers or LPRs along Interstate 10?

[Kahla]: He would have passed one approximately ten miles before he passed me.

A witness may only testify to matters about which they have personal knowledge. Tex. R. Evid. 602. A witness who is not testifying as an expert may testify about matters that are "rationally based on the witness's perception; and [] helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701. The Court of Criminal Appeals has explained that police officers have specialized knowledge and may generally testify based on their

experience and personal knowledge, sometimes as lay witnesses and sometimes as experts, if qualified. *See Osbourn v. State*, 92 S.W.3d 531, 536-37 (Tex. Crim. App. 2002); *see also Romano v. State*, No. 01-18-00538-CR, 2021 Tex. App. LEXIS 3986, at **15-17 (Tex. App.—Houston [1st Dist.] May 20, 2021, pet. ref'd) (mem. op., not designated for publication) (no error to allow police officer as a lay witness to testify about his perception of appellant's conduct at the scene of the crime); *Gonzalez v. State*, No. 04-19-00083-CR, 2020 Tex. App. LEXIS 7669, at **13-15 (Tex. App.—San Antonio Sept. 23, 2020, no pet.) (mem. op., not designated for publication) (no error to allow police officer as a lay witness to testify about how appellant might have committed the crime charged). "Texas law recognizes that police officers may testify concerning knowledge acquired through experience." *Salazar v. State*, No. 01-13-00209-CR, 2014 Tex. App. LEXIS 3983, at *13 (Tex. App.—Houston [1st Dist.] Apr. 10, 2014, no pet.) (mem. op., not designated for publication). Specifically, police officers may testify, based on their experience and training, that a defendant's actions are consistent with the acts of someone committing the crime charged. *See Reece v. State*, 878 S.W.2d 320, 325 (Tex. App.—Houston [1st Dist.] 1994, no pet.) (no error to admit officer's lay opinion testimony that defendant's conduct was consistent with that of someone selling cocaine); *Williams v. State*, 760 S.W.2d 292, 296 (Tex. App.—Texarkana 1988, pet. ref'd) (officer's testimony about a common way to steal cars was admissible as a lay

opinion based on the officer's personal observations and experience as a police officer).

In addition, Detective Detorre testified without objection that, in his opinion, if someone was trying to avoid detection by a license plate reader, then removing the license plate completely would serve that purpose. Ranger Benson also testified without objection that, based on his experience and training, license plates might be found in the trunk of a vehicle if the driver was involved in nefarious activity. "It is well established that questions regarding the admission of evidence are rendered moot if the same evidence is elsewhere introduced without objection; any error in admitting evidence over a proper objection is harmless if the same evidence is subsequently admitted without objection." *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999); *see also Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (explaining that erroneously admitted evidence will not result in reversal when the same evidence was received elsewhere without objection). We find no error, and we overrule Appellant's third issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgments of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on May 19, 2025
Opinion Delivered June 18, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.